656 A.2d 1

P.F. AND B.F., ON BEHALF OF THEIR SON, B.F., PETITIONERS–APPELLANTS, v. NEW JERSEY DIVISION OF DEVELOPMENTAL DISABILITIES, RESPONDENT–RESPONDENT.

Argued November 29, 1994—Decided April 10, 1995.

*Herbert D. Hinkle* argued the cause for appellants.

*Joseph L. Yannotti,* Assistant Attorney General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Todd A. Wigder* and *Judith A. Nason,* Deputy Attorneys General, on the briefs).

*Joseph B. Young,* Deputy Director, argued the cause for *amicus curiae,* New Jersey Protection and Advocacy, Inc. (*Sarah W. Mitchell,* Executive Director, attorney; *Mr. Young, Linda D. Headley,* Senior Managing Attorney, and *David B. Harris,* Deputy Public Defender, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The basic issue on this appeal is whether the Division of Developmental Disabilities (DDD) has satisfied its burden of proving that the proposed transfer of plaintiff B.F., an autistic twenty-one-year-old man, from the out-of-state institution where he currently resides to a New Jersey institution is appropriate. The chief judge of the Office of Administrative Law (OAL) found that DDD had not met that burden, but DDD's director disagreed. In an unreported decision, the Appellate Division reluctantly affirmed the director's decision. We granted the petition for certification of P.F. and B.F., parents of B.F. 137 *N.J.* 166, 644 A.2d 614 (1994). After carefully reviewing the record, we conclude that DDD has not met its burden of proof. Consequently, we reverse the judgment of the Appellate Division.

–I–

B.F. is a severely autistic young man who cannot communicate verbally. He demonstrates perseverative behavior, which manifests itself in repetitive conduct, *e.g.,* pacing incessantly, and rebellion against changes. Furthermore, he has a history of maladaptive behavior and violent tantrums. Because of B.F.'s special needs, the parties agree that his parents cannot care for him at home. For years, B.F.'s parents tried unsuccessfully to find an appropriate placement for their son.

In 1987, the Mountain Lakes School District placed B.F. at the New England Center of Autism (NECA). NECA is a "community-based" residential facility, which provides a group-home setting for autistic individuals. At NECA, B.F. has learned to communicate through various means, including gesturing and the use of communication boards. His violent tantrums now are rare. NECA personnel successfully have taught B.F. many basic self-care skills, such as grocery shopping, banking, planning and preparing meals, and household chores. Significantly, B.F. can work under supervision. He has held part-time jobs at a local fast-food restaurant and a bottled drinking-water company.

In 1990, DDD determined that B.F. was eligible for its services, and began monitoring his progress at NECA. In each of the 1990–91, 1991–92, and 1992–93 school years, NECA personnel prepared an Individualized Educational Plan (IEP), which discussed B.F.'s progress and recommended a course of treatment. Each year, the IEP recommended placing B.F., when he reached twenty-one, in a highly-structured behavioral and communications program at a community-based facility. Each year, DDD concurred in the IEP's findings and recommendations.

To ensure adequate time to prepare B.F. for the transition, his 1990–91 IEP recommended identifying a facility in 1991–92, one year before B.F. turned twenty-one. Although DDD concurred with the IEP, it did not identify any facility during that year.

In August 1992, DDD prepared an Individualized Habilitation Plan (IHP) pursuant to *N.J.S.A.* 30:6D–10. An IHP, which is similar to an IEP, recommends a course of treatment for a DDD client. The 1992 IHP adopted NECA's 1992–93 IEP, which emphasized that to prevent regression, B.F.'s transition must provide for a continuous program. NECA's IEP also recommended training DDD personnel responsible for B.F. in the kinds of programs offered at NECA.

DDD's 1992 IHP also recommended that a psychologist evaluate B.F. Accordingly, in February 1993, Dr. Mark Friedman issued a report to DDD recommending that B.F. stay at NECA. Dr. Friedman noted B.F.'s progress at NECA, expressed concern about the lack of comparable facilities in New Jersey, and warned that B.F. might regress if transferred from NECA.

Between December 1992 and April 1993, B.F.'s parents tried to arrange a hearing with DDD to identify an appropriate placement. At the close of the 1992–93 school year, after B.F. became twenty-one years old, DDD assumed from the Mountain Lakes School District responsibility for B.F.'s placement. Despite Dr. Friedman's recommendations, DDD notified B.F.'s parents in April 1993 that it would transfer B.F. to the "small residential unit number 4" (SRU4) at the North Princeton Developmental Center (NPDC). SRU4 is a pilot program designed as a transitional facility for institutionalized autistic clients.

Fearing that B.F. would lose the basic skills he had developed at NECA, B.F.'s parents objected to the transfer. On June 4, 1993, DDD staff explained to B.F.'s parents how his proposed placement at SRU4 would serve his special needs. The parents disagreed, and the matter proceeded to a hearing before Chief Administrative Law Judge Jaynee LaVecchia of the OAL.

At the hearing, DDD stipulated that NECA is the most appropriate placement for B.F. In addition, the parties stipulated that B.F.'s placement at NECA costs $94,260 per year, and that the proposed placement at NPDC costs $97,090 per year, one-half of which would be absorbed by the federal government. Thus, the

proposed placement at NPDC would cost DDD only $48,545 per year. Ironically, B.F.'s placement at NECA, the most appropriate placement for him, actually costs less than placement at SRU4. DDD's sole reason for seeking to transfer B.F. from NPDC to SRU4 is that, because of the availability of federal funds, DDD will spend fewer State funds to maintain B.F. at SRU4. DDD maintains that its budget does not contain sufficient funding for B.F.'s placement at NECA.

At the hearing before the OAL, DDD presented testimony about the financial ramifications of B.F.'s proposed placement and the likely effect of placing B.F. at SRU4. B.F.'s mother, P.F., and four experts also testified about the effect of transferring B.F. from NECA to SRU4.

In meticulous findings of fact, Chief Judge LaVecchia found that "[t]he overwhelming expert testimony" leads to the conclusion that if DDD transfers B.F. to SRU4, he will regress and lose his basic self-care skills. The chief judge found further that "[r]egression for B.F. would affect his behaviors, his communication, and flowing therefrom, his socialization and community involvement." She also concluded that DDD decided to place B.F. at SRU4 "primarily for financial reasons," noting that the

> meeting wherein B.F.'s placement at SRU4 within NPDC was decided (April 1993), occurred before any professional involved in that decision had met B.F. and evaluated him and his needs. No discussion of regression occurred at this meeting. Since then, aspects of B.F.'s "plan" have been hastily identified apparently in part as a defense to this pending matter.... This does not meet the [statutory] requirements of an individually oriented plan developed utilizing accepted standards of professional judgment.

The chief judge correctly identified *N.J.S.A.* 30:4–25.6 and *N.J.S.A.* 30:6D–9 as the dispositive statutes. *N.J.S.A.* 30:4–25.6 provides that

> [t]he commissioner shall, upon proper application for admission, forthwith admit the eligible mentally retarded person, and provide him with appropriate functional service to the extent available. In the event that the functional service which has been specified as most appropriate from time to time is not immediately available, the commissioner shall provide alternate service....

*N.J.S.A.* 30:6D–9, part of the Developmentally Disabled Rights Act, provides that

> [e]very service for persons with developmental disabilities offered by any facility shall be designed to maximize the developmental potential of such persons and shall be provided in a humane manner in accordance with generally accepted standards for the delivery of such service and with full recognition and respect for the dignity, individuality and constitutional, civil and legal rights of each person receiving such service, and in a setting and manner which is least restrictive of each person's personal liberty.

The chief judge concluded that the legislative standards require that any alternate service must provide "a professionally devised, individually-oriented ... program designed to prevent loss of basic care skills." She then determined that B.F.'s proposed placement at SRU4 could not provide an adequate level of training. Consequently, she recommended that the "placement offered to date by DDD will not be permitted so [B.F.] shall stay at NECA until DDD properly identifies an appropriate placement."

Focusing on fiscal concerns, the director rejected the ALJ's decision. The director candidly acknowledged that "at first review" the chief judge's conclusion "appears to be reasonable." Noting, however, that "most alternate services will not provide the same level of habilitation or will not meet as many of the clients' needs as would the most appropriate placement," he reasoned that the law places "no limitation ... upon an alternate service that requires it to be any specific level of service or designed to prevent loss of basic care skills." The director supported his decision by stating that even under the ALJ's standard "the current habilitation plans and those that will be developed are professionally devised to help B.F. maintain his current fundamental self-care skills." Thus, he concluded that B.F.'s proposed placement at SRU4 satisfied that standard.

–II–

■ With due deference to the director's authority as the agency head to make findings of fact, we are nonetheless forced to conclude that the record does not support his conclusion that SRU4 is an appropriate "alternate service" within the meaning of

*N.J.S.A.* 30:4–25.6. Although SRU4 may be appropriate for some of DDD's clients, the record demonstrates that it is inappropriate for B.F.

The Legislature has evinced a strong concern for the rights of the developmentally disabled. *N.J.S.A.* 30:4–25.6 entitles those needing DDD's services to the "[most] appropriate functional service to the extent available." Furthermore, in the Developmentally Disabled Rights Act, the Legislature explicitly

> f[ound] and declare[d] that the developmentally disabled are entitled to certain fundamental rights as citizens and that these rights shall not be abrogated solely by reason of admission to any facility or receipt of any service for developmentally disabled persons; that services which are offered to the developmentally disabled shall be provided in a manner which respects the dignity, individuality and constitutional, civil and legal rights of each developmentally disabled person....
>
> [*N.J.S.A.* 30:6D–2.]

The strength of that declaration suggests that the Legislature would not want DDD's budgetary problems, as difficult as they may be, to compel the removal of B.F. from the most appropriate facility to one that is inappropriate.

Although courts typically defer to statutory interpretations by administrative agencies, *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 327, 478 *A.2d* 742 (1984), such deference is inappropriate when an agency interpretation clearly conflicts with the intent of the Legislature, *GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 314, 625 *A.2d* 468 (1993). Thus, we conclude that the director's suggestion that state law imposes no minimum qualitative standards for an alternate service contravenes the intent of the Legislature. We believe that the chief ALJ's definition of "an alternate service" as a professionally devised program designed to maintain a client's basic self-care skills comes closer to the Legislature's mandate. In adopting that standard in this case, we recognize that DDD, after notice and hearing, may adopt a regulation setting a different standard. *N.J.S.A.* 52:14B–4.

Ordinarily, an appellate court will reverse the decision of an administrative agency only if it is arbitrary, capricious, or

unreasonable, or if it is not supported by substantial credible evidence in the record as a whole. *Dennery v. Board of Educ.,* 131 *N.J.* 626, 641, 622 *A.*2d 858 (1993); *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988); *Rowatti v. Gonchar,* 101 *N.J.* 46, 51–52, 500 *A.*2d 381 (1985); *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980); *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). *See generally* Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 11.2 (3d ed. 1994) (discussing "substantial evidence test"). When an agency's decision is manifestly mistaken, however, the interests of justice authorize a reviewing court to shed its traditional deference to agency decisions. *Clowes, supra,* 109 *N.J.* at 588–89, 538 *A.*2d 794.

In searching for the appropriate judicial role in this case, we are aware of the sharp differences between the chief ALJ and the director. An agency head need not defer to the findings of an administrative law judge. *In re Kallen,* 92 *N.J.* 14, 20, 455 *A.*2d 460 (1983). The agency head, however, may not ignore an administrative law judge's abundantly supported conclusions. *Department of Health v. Tegnazian,* 194 *N.J.Super.* 435, 450, 477 *A.*2d 363 (App.Div.1984). Our review of the decisions of the director and the OAL lead us to the inescapable conclusion that preoccupation with budgetary problems unduly affected the director's reading of the record.

Chief Judge LaVecchia carefully documented her conclusion that placing B.F. at SRU4 is not appropriate, and that the placement likely would lead to B.F.'s regression and his loss of skills. Even DDD's experts agreed that B.F. likely will regress if transferred to SRU4. The director likewise acknowledged that SRU4 is not the most appropriate placement for B.F., and that B.F. would regress if moved from NECA to SRU4. He argued, however, that budgetary problems compelled the placement and suggested that B.F.'s loss of skills would not be permanent. In making that suggestion, the director relied on DDD's expectations

that eventually it would provide an appropriate level of service at SRU4.

Recent events have undermined that reliance. Since oral argument, DDD has recommended the closure of NPDC, which would include SRU4. The director expects the Commissioner of Human Services to make a decision later this month whether to close NPDC. If the commissioner closes NPDC, B.F. would be subject to yet another transfer by the end of 1997.

We are mindful of the fiscal constraints confronting DDD and of its goal of achieving the greatest good for the greatest number of its clients. An administrative agency's commitment to collective justice, however, cannot relieve the agency of statutory obligations to the individuals it was created to serve. On this record, we cannot ignore the potentially disastrous effect of the contemplated transfers on so fragile an individual as B.F.

–III–

As we recently stated, "in proceedings instituted to challenge the DDD's placement decisions, the Division bears the burden of proving that its choice is the most appropriate for the developmentally-disabled client." *J.E. v. State*, 131 *N.J.* 552, 570, 622 *A.*2d 227 (1993). On this record, we find that DDD has not met its burden. We hold that DDD may not transfer B.F. from NECA until such time as an appropriate alternative placement becomes available.

The judgment of the Appellate Division is reversed.

For reversal–Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN–6.

Opposed–None.