693 A.2d 531

DAVID H. CASCIANO, PETITIONER–APPELLANT, v. BOARD OF REVIEW, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted January 22, 1997—Decided May 16, 1997.

Before Judges PRESSLER, STERN and WECKER.

*David H. Casciano, pro se,* submitted a brief.

*Peter Verniero,* Attorney General, attorney for respondent (*Alan C. Stephens,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

WECKER, J.S.C., t/a

Petitioner David H. Casciano appeals from a final decision of the Board of Review, affirming the decision of the Appeal Tribunal, which held him disqualified for unemployment benefits because he

left the job without good cause attributable to the work. *N.J.S.A.* 43:21–5(a). That statute provides in pertinent part:

An individual shall be disqualified for benefits:

(a) For the week in which the individual has left work voluntarily without good cause attributable to such work, and for each week thereafter until the individual becomes reemployed and works four weeks in employment ... and has earned in employment at least six times the individual's weekly benefit rate, as determined in each case.

It is undisputed that petitioner was employed by Princeton Telephone Answering Service, Inc. (Princeton) from July 1994 through March 3, 1995. He then began employment with the Internal Revenue Service on March 6, but was laid off on March 17 and therefore did not have sufficient service with the Internal Revenue Service to qualify for unemployment benefits from that employer.

The Appeal Tribunal heard only two witnesses: petitioner and a former assistant manager [1] employed at Princeton. There was no evidence before the Tribunal that contradicted petitioner's testimony. According to petitioner, he sought to change jobs for two reasons. First, he claimed he was pressured to participate in intentional overbilling of clients. Second, he claimed his wages were underpaid, allegedly in violation of the Wage and Hour Law. If true, we have no doubt that each of those circumstances alone would establish "good cause attributable to [the] work." Petitioner testified with respect to the overbilling that he

went from total innocence, believing everything was correct, to suspecting that something was wrong, to being reasonably sure that something was wrong.

In response to questioning by the Appeals Examiner, petitioner testified as follows:

A. No, I proceeded to look for another job.

\* \* \* \* \* \* \* \*

---

[1] That witness also had a pending benefits claim. Her brief testimony was largely irrelevant.

In other words, I didn't leave without having another job. I didn't want to go that route and file unemployment. When I realized that, I proceeded to look for another job.

Q. Okay, go ahead continue.

A. And then I did obtain a job commitment from the Internal Revenue Service which they lead me to be would be a longer duration. There was an inadvertent thing that came up, and it took me approximately two months to actually get the commitment from the Internal Revenue Service. I had an interview and I had to go for testing and a security clearance.

Q. Okay, while though you were waiting for this job to come through, you made the application with the Internal Revenue Service, you continued to work for your employer, Princeton Telephone. Is that correct?

A. That is correct.

In response to further questioning, petitioner testified that when the IRS made a firm job offer, he told Princeton he would be leaving. At the hearing, he further described the overbilling situation and his conversations with the employer about his concern:

Q. Okay, when you left Princeton Telephone Answering Service, what reason did you give them?

A. That I had taken a job with the Internal Revenue Service.

Q. Okay, did you at all mention at that time anything about any dissatisfaction with things at work?

A. Not at that time. I mean, there were questions. I had asked considerable questions regarding the accounting on the customer accounts.

Q. Okay, at that time when you realized things were not on the up and up so to speak or you felt that they were not on the up and up, did you approach your employer and question your employer about these things?

A. Yeah.

Q. And what was his response?

A. His response would be to justify them for me in the same way I was expected to justify them to the clients. However, in some cases later on, it just came down to it could not be justified. For example, where a client had an 800 number that was being answered and they were billed by the 800 carrier for each call that came in on that 800 line and they were billed for the 800 carrier for 70, 80 calls and they were being billed for 300 calls for the month, you know, I can't see any explanation other than the customer is lying about his MCI bill or MCI is undercharging him grossly.

Q. Okay, what would you tell the customer if they called to question it? Did they ever call to question their bills?

A. Oh, yes. I took many calls a day on questions from customers. I guess I was in charge of the customer relations department.

Q. Okay.

A. For all four answering services, not just Princeton. There were four answering services and all the calls would be routed to me, unless they were routed to an assistant manager.

Q. Okay, did your employer request that you just continue to make excuses?

A. Well, my instructions were, keep the client at all costs.

Q. All right, if it meant that there was a problem, were you to bring that problem to the front?

A. No basically, if there was a problem, either convince them that the bill was correct or if necessary make an adjustment on the bill to keep the client from canceling.

Q. So, you were permitted. He wasn't asking you to, you know, if there was a problem, that you could make an adjustment on the bill?

A. Well, within limits.

Q. Okay, but ...

A. I mean understand the amount of adjustment that I could make on the bill was limited, and I quite often not even a small portion of what the person would have been overcharged over the year.

Q. Okay.

A. If the man was being overcharged $100.00 a month, and I could give him a credit of $50.00 or $60.00, that doesn't even begin to cover $1,200.00.

Q. Okay.

A. I mean usually the customers would call because they would think that their bill was far too high and then they would keep a record of their incoming calls that they got and then after keeping the record, they would question it. So, I mean, it was not possible. You know, I could not do equity for them. It was not within my authority.

In further testimony, petitioner described a situation just before he left Princeton, when he discovered that a client had been billed twice for the same month, and when he

brought it to the attention of the bookkeeper, she told me that she was ordered to do that, and when I brought it to the attention of the manager that they were charging him for a month that he had already paid, I was told that if a customer hadn't said anything to leave it alone.

According to petitioner, "the customers were overbilled on message units as a matter of course," and when he made adjustments in response to complaints, he was threatened with firing. Petitioner explained in some detail how the overbilling for message units could be discovered by comparing the number of calls on the clients' "800" number bills from the regular telephone

company with the answering service's claimed calls for the same period.

There was no testimony or evidence from Princeton, and nothing in the record that contradicted petitioner's explanation for leaving that employer. The Board of Review adopted the findings and conclusions of the Appeal Tribunal as follows:

> The claimant worked for employer # 1 as a manager, from 7/94 through 3/3/95, at which time he left the job. The claimant worked for employer # 2 from 3/6/95 through 3/17/95 at which time he was laid-off due to lack of work.
>
> The claimant left the job with employer # 1 for two reasons. The claimant left the job to accept a position with employer # 2. The claimant would not have left his job with employer # 1, at that time, had he not secured another position.
>
> The claimant also left the job with employer # 1 because he was dissatisfied with conditions at work. On several occasions the claimant did discuss his dissatisfaction with his employer.
>
> Though the claimant was dissatisfied with conditions at work, his actions of remaining at his job until he secured subsequent employment is evidence, that his acceptance of another position is the main reason for leaving his job at that time. This is considered a personal reason for leaving his job and without good cause attributable to the work.
>
> In order to avoid disqualification under *N.J.S.A.* 43:21–5(a), a claimant must demonstrate that the reason for leaving was work connected. A claimant who leaves work for a personal reason, no matter how compelling, is subject to disqualification. *Self v. Board of Review,* 91 *N.J.* 453, 453 *A.2d* 170 (1982).
>
> After careful review of all testimony, it is the findings of this Tribunal that the claimant left his job with employer # 1 for personal reasons. He has not established good cause for leaving which is attributable to the work. He is therefore disqualified in accordance with *N.J.S.A.* 43:21–5(a) as of 2/26/95.

The Board further concluded:

> While the claimant believed customers were being overbilled it was within his authority to correct erroneous billings. Additionally, there was no evidence the employer was not paying the claimant properly.

In *Rider College v. Board of Review,* 167 *N.J.Super.* 42, 46, 400 *A.2d* 505 (App.Div.1979) we held that a college teacher who accepted a more favorable position left the first job for personal reasons and was therefore subject to the statutory disqualification. We there noted that

> [i]n determining whether a claimant is disqualified [from receipt of unemployment benefits under *N.J.S.A.* 43:21–5(a) ], courts have ... focused on the factors at work which cause a person to quit his employment. We have consistently held that

causes personal to a claimant and not attributable to the work come within the disqualification of the statute.

As we also said in *Rider College,*

[t]he conclusion of the Board of Review, that leaving work to accept a "substantially more favorable position" does not constitute disqualification for benefits, does not comport with the statutory test which provides for payment of benefits in the case of a voluntary quit *only if leaving work is with good cause attributable to such work.*

[167 *N.J.Super.* at 48, 400 *A.*2d 505 (emphasis added).]

There is no evidence that petitioner in this case, unlike the *Rider College* teacher, sought or accepted the job with the IRS for any reason other than that the working conditions required immoral if not illegal conduct.

We find nothing in the record to suggest that the Board did not believe petitioner's testimony about the overbilling situation. Irrespective of the claimed underpayment of wages, for which the supporting evidence before the Board [2] was insubstantial, a reasonable interpretation of the statute compels the conclusion that petitioner indeed had "good cause for leaving which is attributable to the work."

Where an agency is charged with enforcing a statute, "courts accord substantial deference to the interpretation given to the statute by the agency...." *Board of Educ. of Tp. of Neptune v. Neptune Tp. Educ. Assn.,* 144 *N.J.* 16, 31, 675 *A.*2d 611 (1996). However, an appellate court is not bound by the agency's interpretation. *Mayflower Sec. Co., Inc. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). Deference to agency interpretation of a statute is appropriate as long as that interpretation is reasonable, *In re Musick,* 143 *N.J.* 206, 217, 670 *A.*2d 11 (1996); *L.M. v. State of New Jersey, Div. of Med. Asst. and Health Servs.,* 140 *N.J.* 480, 489–90, 659 *A.*2d 450 (1995); *Metromedia, Inc. v. Director, Div. of Taxation, supra,* 97 *N.J.* at 327, 478 *A.*2d 742; and does not

---

[2] On appeal petitioner submitted with his Appendix a copy of a letter determination apparently from the Office of Wage and Hour Compliance, awarding him $231.69 in back wages from Princeton. Even if we were to consider such an unauthorized addition to the record, its evidential value would be minimal.

conflict with the express or implied intent of the legislature, *P.F. v. New Jersey Div. of Dev. Disabilities,* 139 *N.J.* 522, 529, 656 *A.*2d 1 (1995); *Kletzkin v. Borough of Spotswood Bd. of Ed.,* 136 *N.J.* 275, 278, 642 *A.*2d 993 (1994).

■ While "the limited scope of judicial review [of an agency decision] must be borne in mind ...," we are constrained to reverse where there is "a showing that it was arbitrary, capricious or unreasonable...." *Campbell v. Dep't. of Civil Service,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963), *relied upon in Matter of Musick, supra,* 143 *N.J.* at 216, 670 *A.*2d 11.

■ There is a clear public policy in this state to protect employees who protest illegal activity by their employers. *See N.J.S.A.* 34:19–1 *et seq.; Pierce v. Ortho Pharmaceutical,* 84 *N.J.* 58, 417 *A.*2d 505 (1980). While this is neither a discharge nor a "whistleblower" case, public policy nevertheless requires that petitioner's legitimate distress when required by his employer to act illegally or immorally be recognized as good cause for leaving. We conclude that the Board's determination that petitioner left Princeton "for personal reasons ... [not] attributable to the work" is arbitrary, capricious and unreasonable.

We reverse and remand for entry of an appropriate award consistent with this opinion.