712 A.2d 1158

FRANK COSTANTINO, PETITIONER–APPELLANT, v. NEW JERSEY MERIT SYSTEM BOARD AND DIVISION OF MOTOR VEHICLES, NEW JERSEY DEPARTMENT OF TRANSPORTATION, RESPONDENTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 27, 1998—Decided June 16, 1998.

Before Judges PRESSLER and CONLEY.

*Michael J. Herbert* argued the cause for appellant (*Herbert, Van Ness, Cayci & Goodell,* attorneys; *Mr. Herbert,* of counsel and on the brief).

*Vicki A. Mangiaracina,* Deputy Attorney General, argued the cause for respondent Division of Motor Vehicles (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Mangiaracina,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Appellant Frank Costantino appeals from the final administrative determination of the Merit System Board (Board) upholding his termination from the position of Administrative Analyst I with the Division of Motor Vehicles (DMV) based on an adjudication of conduct unbecoming a public employee, *N.J.A.C.* 4A:2–2.3(a)(6), *N.J.A.C.* 4A:2–2.3(a)(9), by reason of a continuing course of sexual harassment of an employee under his supervision, Cynthia Scorsolini, over a period of fourteen months, namely, from September 1992 to November 1994. We reverse and remand for a new hearing.

This appeal was first before us in June 1997 under Docket Number A–6719–95T1, and by our opinion filed on July 14, 1997, we remanded to the Board for its further consideration. The basis for our action at that time was the Board's blanket acceptance, without any expressed analysis, of the factual and procedural findings by the administrative law judge despite the extensive and detailed exceptions filed by appellant. As we explained in that opinion, "we are simply at a loss to determine, regardless of how much of the record was actually reviewed, whether the Board

rejected appellant's detailed and substantial exceptions as a result of the required 'personal understanding of the evidence,' or simply as a result of a blind 'signing on the dotted line.' *Matter of Fichner*, 144 *N.J.* 459, 472, 677 *A.*2d 201 (1996) (quoting *Lone Star Greyhound Park v. Texas Racing Commission*, 863 *S.W.*2d 742, 749 (Tex.Ct.App.1993))." (Slip opinion at 6). Our concern for the adequacy of the Board's review was evidently generated by what we then described as the ALJ's "selective discussion of the evidence."

Pursuant to our remand, the Board issued a new final decision on October 7, 1997. Since we did not retain jurisdiction, appellant filed this second appeal, raising all of the procedural and factual challenges he raised on the first appeal. We reject the procedural challenges for the reasons explained by the Board in its final decision, with which we agree and which we find to be well founded in the applicable law. Our grave concern remains, however, with the Board's factual findings.

Trial of the charges of sexual harassment brought by the complaining employee involved, in the final analysis, the necessity for a critical finding as to credibility. That is to say, Scorsolini's claims both as to specific events and appellant's general conduct were largely uncorroborated and, to a significant extent, were contradicted by the witnesses produced both by DMV and appellant. We do not suggest that it was beyond the discretion of the ALJ to credit Scorsolini's testimony, despite the lack of corroboration and the contradiction. The problem here is somewhat different. As we will further explicate hereafter, the credibility finding in favor of complainant made by the ALJ is, in our view, irremediably tainted by a skewed analysis of the evidence adduced at the contested-case hearing. The ALJ confused testimony given under oath by several of the key witnesses with their paraphrased, unsigned and unsworn interviews given to a State investigator. Other testimony was mischaracterized. Exculpatory evidence was ignored. Unjustified innuendoes, either unsupported or contradicted by the record, were indulged in. Office gossip took prece-

dence over sworn testimony. While the review of the testimony by the Board on remand was somewhat more balanced, that testimony was not analyzed but merely summarized in its more inculpatory aspects, and no findings of fact were made thereon. In the end, after reciting the testimony, all that the Board did, in effect, was to accept the ALJ's credibility finding in favor of Scorsolini. But since we have concluded that that credibility finding was tainted because of the inadequacies of and inaccuracies in the ALJ's evaluation of the evidence, it simply was not eligible for acceptance by the Board. In this posture we see no reasonable alternative available to protect the rights of the appellant, the public and Scorsolini short of a new contested-case hearing before a different ALJ.

In order to place the matter in a proper factual context, we address first what appear to be the undisputed facts of the employment relationship. As we understand the record, sometime prior to the fall of 1992, DMV decided to expand its system of Regional Service Centers. There were to be four such centers, one in Wayne, one in Eatontown, one in Deptford, and one in Trenton. The centers were to be serviced by a technical support unit, which was originally housed in DMV facilities in Quakerbridge. By early fall of 1992, the technical support unit had been set up with Denise Mattei as the manager and under her, appellant, a long-time DMV employee. There were three supervisors under appellant, Ira Kupersmit, Maria Jacobi, and Scorsolini. Kupersmit, a long-time technical support person, was primarily responsible for personnel training and setting up procedures in what DMV refers to as driver conferencing. Jacobi, also experienced in technical support, worked with Kupersmit. Scorsolini was new to technical support, having been assigned to that unit from a position involving direct customer service. It was anticipated that she would be in charge of the fee audit unit, which, we gather from the record, was to be responsible for prescribing uniform procedures for fee collection by the Regional Service Centers and training their personnel.

One of the major initial projects of the technical support unit was the preparation of a fee unit manual for use by the service training centers. Appellant had originally assigned Jacobi to that task, to be performed under his supervision. Although she apparently had begun it, she soon advised appellant that because of all her other responsibilities, she was unable to give it sufficient time for completion by the target date, which, we gather, was the scheduled opening of the Eatontown Regional Service Center. Kupersmit also had too many other responsibilities. Appellant therefore assigned the project to Scorsolini taking into consideration that she was or would be the supervisor of the fee audit unit charged with implementing the manual's procedures. Because of her lack of experience with fee collection and audit, she needed a substantial amount of supervision and training in order to do that job, and it was appellant's job to provide it. In any event, she undertook that responsibility under appellant's direction. We must also here point out that because of the anticipated relationship between the technical support unit and the Regional Service Centers, it was also part of appellant's job to make field visits to the Centers for purposes of training, inspection, and general assistance. It was his undisputed testimony that he rarely made those trips alone. When the subject of his visit was driver conferencing, he took Kupersmit or Jacobi with him. When it was audit, he took Scorsolini. If both areas of technical support unit responsibility were involved in the field trip, he took the supervisors from both units. In any event, the technical support unit began to grow, and within several months of its inception in Quakerbridge, it relocated to a Trenton DMV facility, a different facility than the one housing the Trenton Regional Service Center. At about that time, there were fourteen women in the unit and two men, appellant and Kupersmit.

Scorsolini made her complaint of sexual harassment against appellant in November 1993, shortly after Kupersmit and Jacobi had received promotions and she had not. The gravamen of her complaint involved one specific incident as well as general charges of a regular course of conduct. The specific allegation was that in

late October or early November 1992, while she and appellant were returning to Trenton by car from a field visit they had made together to the Wayne Regional Service Center, appellant placed his hand on her leg and told her he was attracted to her and believed she felt the same way about him. According to her testimony, she then told him that she was happily married and "would never do anything like this." That was the end of the matter at that time. The asserted general course of conduct was appellant's alleged constant physical proximity to her, his invitations to lunch and coffee breaks, his standing over her and seeking her out, and her sense of being crowded and surrounded that he constantly generated in her. As illustrative of that conduct, Scorsolini related her experience at a driver conferencing training course. She claimed that appellant was constantly behind her as she sat at her computer terminal, making her so uncomfortable that she stopped going to the course long before its completion.

In sustaining the ALJ's conclusion that appellant had subjected Scorsolini to a hostile environment by reason of his continuing course of conduct towards her, the Board on remand, pointed to these elements of her findings:

1) the October/November 1992 incident described above [the Wayne trip referred to above], 2) asking complainant to accompany him on personal errands during work hours, 3) asking complainant to accompany him alone on trips to regional offices, 4) asking complainant to have lunch alone together, 5) sitting next to complainant in the coffee break room and rubbing his leg against hers, 6) continually hovering over complainant and physically crowding her during work hours, 7) standing behind and leaning over complainant in a driver history training class to such a degree that complainant was forced to withdraw from the class, 8) asking complainant to accompany him on an overnight trip to Atlantic City to attend a conference so that complainant could give a training course in Driver History, despite the fact that complainant was the least qualified of appellant's three subordinates to provide that training, 9) rejecting complainant's request to spend a week at the Eatontown Regional Center, instead, allowing her to go to the Trenton Regional Center, within walking distance from appellant's office. The ALJ found that the above instances, including that which occurred in October/November 1992 on route from Wayne to Trenton, taken in the aggregate, constituted sexual harassment by appellant towards Ms. Scorsolini. The ALJ recommended that the charges against appellant be sustained and the penalty of removal be affirmed.

These findings are troublesome to us. Some of them, and particularly their innuendoes, are completely unsupported by the record. Others are based on a total disregard of what the facts of the operation of DMV were all about. And others were made despite the overwhelming weight of contradictory testimony. It is, of course, true that some of the findings were supported by the record, but those findings were based exclusively on Scorsolini's credibility. But, as we have explained, the finding of Scorsolini's credibility was rendered unreliable by the skewing of the record by the ALJ.

We address these findings with particularity. We have already referred to the Wayne trip and agree that Scorsolini's version and appellant's denial posed a simple matter of credibility.

As to the second finding, appellant conceded that he had asked Scorsolini on at least one occasion that he could remember to accompany him on a personal errand, a visit to his lawyer. He asserted that he had done so because he was in the middle of explaining some significant matter to Scorsolini that she had to know about for the manual, and thought they could continue discussing it on the trip without losing time. Scorsolini never denied that office business was discussed on that occasion and never suggested that anything untoward happened during that trip. Yet appellant's apparently reasonable explanation was totally disregarded.

As to the third finding, asking Scorsolini to accompany him alone on trips to regional offices, we see no basis for disregarding the apparently credible testimony of appellant, Jacobi, and Kupersmit as to what these trips were all about, why they were necessary, and why the unit supervisors, of whom Scorsolini was one of three, were appropriately asked to make such a trip. Indeed, Scorsolini conceded that after the Wayne trip, she made at least two more unaccompanied trips with appellant to a regional center, that she did so because it was her job, and that nothing untoward happened.

As to the fourth finding, the invitations to have lunch, there was disregarded and undisputed testimony that on at least one occasion Scorsolini initiated the invitation. Apparently members of the technical support unit customarily socialized during lunch and coffee breaks.

The fifth finding is particularly troublesome. The ALJ found as a fact that defendant habitually sat next to Scorsolini in the coffee break room, "rubbing his leg against hers." Appellant denied that this was so. Scorsolini testified that it happened on occasion but she was not sure if the leg touching was intentional or not. The corroboration relied on by the ALJ to establish Scorsolini's credibility as to the event having taken place at all was the evidence of Maria Cook, an employee of the technical support unit, who described herself as Scorsolini's best friend. This is how the ALJ summarized Cook's evidence:

> Marge Cook testified that she observed appellant rubbing complainant's shoulders and getting physically very close to complainant. Cook said that complainant told her that she (complainant) was afraid of appellant, and that complainant made Cook come to lunch with her and appellant, when appellant asked complainant to go to lunch. Cook said that appellant never took no for an answer, even if complainant "got nasty" in her replies to appellant. On one occasion, Cook heard appellant ask complainant what she was doing, and complainant replied that she was doing her work and didn't appellant have any work of his own to do. (Complainant testified, that after a similar exchange, appellant said to her, "[d]o you know who you're talking to?") Cook said that appellant would never "let up," even if complainant was rude to him. Cook said that appellant was around complainant all the time. Cook heard Jackson saying to complainant, "[H]e's up your ass constantly." If complainant was out of work for the day, Cook said that the workers in her section would not see much of appellant, whereas they would see him all the time when complainant was at work. Cook also said that she saw appellant sitting "leg to leg" with complainant in the coffee break room, and observed complainant moving her leg away from his. Cook said that she also has overheard appellant asking complainant to run personal errands with him during the work day, and that appellant always seemed to be close to complainant, not giving her "breathing space." Cook said that complainant was quite upset about the Wayne incident, and seemed very nervous, not believing that something like that could really happen.

This summary, not commented upon by the Board in any way except to note that the ALJ found it to be corroborative of Scorsolini's complaint, exemplifies, illustrates and explains our

inability to accept the ALJ's credibility finding relied on by the Board.

We preface our analysis of this summary to point out that as soon as Scorsolini had made her formal complaint of a hostile work environment by reason of appellant's alleged sexual harassment, an investigator was assigned to the matter by the Department of Law and Public Safety. The investigator interviewed about twenty people, including most of the technical support unit's personnel, but for some reason, not satisfactorily explained, not Mattei, the manager of the unit who testified for appellant at the hearing. The investigator's technique was to take notes of her interview with each person and then to paraphrase the substance of the interview from her notes to create a statement of each interviewee. The person interviewed was never, however, shown the statement, asked to verify its accuracy, or asked to sign it. The interviews were not conducted under oath.

We return to the summary of Cook's "testimony" quoted above. The fact of the matter is that Cook, in her hearing testimony, never made any reference to anyone named Jackson. No questions were addressed to her by either side regarding Jackson, and we have no idea, from this record, who that might be. The reference to Jackson came from her paraphrased statement to the investigator. We find it inexplicable and intolerable that an unsworn extra-judicial statement made by a trial witness could have been characterized by the finder of fact as testimony. We think it obvious that in this posture, the prior unsigned statement could appropriately have been used to impeach Cook's trial testimony. However, unless it met the conditions for a prior inconsistent statement pursuant to *N.J. Evid. R.* 803(a)(1), it did not qualify as competent evidence. And while we recognize that hearsay evidence is admissible in an administrative hearing, its admission is a matter for the discretion of the trier of fact. Hearsay is not, as the ALJ seemed to suggest, required to be admitted. Moreover, the finder of fact is required to give reasonable and proportionate weight to all of the evidence. Unsigned

and unsworn extra-judicial statements made by a declarant who testifies at trial simply cannot stand on an equal footing with the sworn trial testimony when they are neither reiterated, adopted, or reaffirmed under oath. The acceptance of such statements as testimony by the ALJ on several occasions fatally undermined her consequent findings.

A further reference to the ALJ's summary of Cook's statement is necessary. The summary ascribes to Cook the testimonial statement that she saw "appellant sitting 'leg to leg' with complainant in the coffee break room and observed complainant moving her leg away from his." First, this is not the leg-rubbing found by the ALJ. Second, Cook did not say a word about leg-rubbing during her direct testimony. This was her entire testimony on the subject, given only on cross-examination:

Q. Okay. And—and did you ever see him rubbing his leg against her leg?

A. Yes, I did.

Q. When was that?

A. When we were at Quakerbridge. I don't know if it was actually rubbing leg against leg, but they were sitting—like there was a long table and we were learning the auditing. And they were sitting next to each other, and his leg was touching hers.

Q. Well—

A. I'm not saying if he—he was not rubbing her leg with his hand if that's what—

Q. Okay. So you didn't see—

A. —you're saying.

Q. —you didn't see him rubbing his leg against hers?

A. No. But there was—he was very close.

The ALJ's summary also noted Cook's testimony that she observed appellant "rubbing complainant's shoulders." This is her actual testimony, again elicited only on cross-examination:

Q. Let's be clear about it. You—you're testifying that you saw—

A. Yes, I did.

Q. —Frank Costantino massaging her shoulders?

A. Yes. Just like that. Like, you know, when you're tense and somebody goes like that to your shoulders.

Q. Did you ever report this to anybody even after the complaint was issued?

A. No. Because at the time I didn't really feel that was any—there was anything wrong with that.

Q. You didn't feel there was anything improper at that time?

A. No. No.

The balance of Cook's testimony consisted primarily of what Scorsolini had told her as well as the repetition of bits of rather crudely stated office gossip suggesting appellant's attraction to Scorsolini. There was certainly nothing else in Cook's direct observations of the interactions between Scorsolini and appellant that were inconsistent with Scorsolini's primary task, under appellant's direct supervision, of preparing the fee unit manual, a task which necessitated a great deal of communication between them.

We make briefer reference to the balance of the findings. As to the sixth, none of the witnesses produced by either party corroborated, as a matter of their own observation, Scorsolini's testimony of appellant's "continually hovering over complainant and physically crowding her during work hours." The tenor of the testimony is that they had an appropriate, albeit close, working relationship, characterized by personal regard. Certainly, appellant liked her, took pains to teach her how to perform her job effectively, and gave her a great deal of attention in the manual preparation.

There was substantial testimony respecting the subject of the seventh finding, that appellant was "standing behind and leaning over complainant in a driver history training class to such a degree that complainant was forced to withdraw from the class." None of it corroborates Scorsolini's version. All of it contradicts it. These are the undisputed facts. The five-week course was taught by Kupersmit with Jacobi's assistance and under appellant's direction. Driver conferencing personnel from the Regional Centers as well as a group from the technical support unit were asked to attend. There were about twenty attendees in all. The classroom was set up with two students at each computer terminal. Scorsolini was paired with a technical support unit secretary, Eileen Ciocian. The class was under the direct observation of Kupersmit and Jacobi. Appellant made regular visits to the classroom. Scorsolini's testimony was the appellant "created a

situation" for her when he was in the room "because he was always on top of me.... I couldn't pay attention to what was going on because he was always saying something to me. And he would just hover over me and just—you can't concentrate when somebody's standing over you, constantly talking to you and—you just can't concentrate." As a result, she said, she quit the course after several days. None of the other technical support people who were in the classroom, including Kupersmit and Jacobi, observed any of this alleged conduct. Indeed, all agreed that appellant's visits to the class were relatively brief—he was in and out. Most significantly, Ciocian, who shared the computer terminal with Scorsolini, testified that during appellant's visits to the classroom, he would stand about five feet behind the students, looking at their terminals, occasionally pointing something out. As she explained it:

Q. And when he assisted you did he—did he go over—if you will, over your shoulder or did he go to the side of you between you and Cindy—you and—yes, you and Cindy?

A. Yeah. Right. Yeah. Over the—over my shoulder between the two of us.

Q. Did you find his conduct in any way inappropriate when he did that?

A. No.

Ciocian's testimony was also completely disregarded as was appellant's corroborated testimony that the reason given by Scorsolini for leaving the class was her perception that its subject matter, driver conferencing, did not sufficiently relate to her major area of responsibility, fee audit, to warrant her attendance.

The testimonial contradictions of the eighth finding, the alleged Atlantic City proposal, were also disregarded. Appellant's corroborated testimony was that he decided that all of the technical support people were too busy to go and that he announced to the staff that he would have a Regional Center representative attend.

The ninth finding, that appellant rejected Scorsolini's request to spend time at the Eatontown Regional Center instead of the Trenton Regional Center to acquire further experience with fee audit is, in our view, just plain silly. Nothing in the record other than Scorsolini's conjecture suggests that he did so to keep her

near him. It was perfectly reasonable for him to prefer that she not spend large amounts of time away from and out of reach of the office when her purpose of studying a Center operation could be accomplished nearby.

We have taken pains with these findings, not because the legitimate record could not support the charges against appellant, but to demonstrate our disturbing sense of uneasiness with the manner in which the administrative determination was reached. We recognize that a finding could have been made that Scorsolini confided to at least three others in the unit regarding the Wayne event and her great distress occasioned by it, and that certainly would have enhanced her credibility on this critical issue. On the other hand, so much was ignored. In addition to the evidence we have referred to, it is undisputed that Scorsolini gave gifts to appellant, that she initiated much of their one-on-one contact, and that she would seek out an interview with him in his office from time to time, closing the door behind her. Moreover, so many of the events and observations are ambiguous with respect to their actual or intended import. Was this merely a close working relationship consistent with the demands of the job in which there was a degree of mutual affection? Were the attentions shown Scorsolini by appellant always unwelcome? Was there an innocent flirtation or an actionable sexual harassment, intended or unintended? Was the so-called reasonable-woman standard of *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 611–615, 626 *A.*2d 445 (1993) met?

Both appellant and Scorsolini are entitled to the answers to these questions. But those answers must be reached by a fair balancing of the reliable evidence considered in its totality, and not by disregarding all the exculpatory evidence and confusing unsworn office gossip with testimony under oath. We have no confidence that there was a fair consideration of the evidence here. While we recognize the burden necessarily entailed in retrying this case, now so long after the events, we see no alternative to that remedy.

We appreciate the deference we owe to the administrative process and our obligation to accept administrative findings when they are supported by the record as a whole. *See, e.g., Brock v. Public Service Elec. & Gas Co.,* 149 *N.J.* 378, 383, 693 *A.*2d 894 (1997); *SSI Medical Serv. v. State Dept. of Human Serv.,* 146 *N.J.* 614, 620, 685 *A.*2d 1 (1996). Nevertheless, as we explained in *Chou v. Rutgers,* 283 *N.J.Super.* 524, 539, 662 *A.*2d 986 (App.Div. 1995), *certif. denied,* 145 *N.J.* 374, 678 *A.*2d 714 (1996), "our review of an agency's decision is not simply a *pro forma* exercise in which we rubber stamp findings that are not reasonably supported by the evidence...." Thus, we need not defer to an agency decision that is manifestly mistaken. *P.F. v. New Jersey Div. of Developmental Disab.,* 139 *N.J.* 522, 530, 656 *A.*2d 1 (1995). And while we cannot say here that the decision was manifestly mistaken, we are persuaded that the decision-making process was.

Accordingly, the final determination of the Merit System Board is reversed, and we remand for a new contested case hearing before a different administrative law judge.