748 A.2d 613

J.D., BY HIS GUARDIAN, D.D.H., PETITIONER–APPELLANT,
v. NEW JERSEY DIVISION OF DEVELOPMENTAL
DISABILITIES, RESPONDENT–RESPONDENT.[1]

Superior Court of New Jersey
Appellate Division

Argued February 2, 2000—Decided April 10, 2000.

---

[1] This appeal was previously consolidated with *D.F. v. New Jersey Division of Developmental Disabilities*, Docket No. A–2934–97. However, for ease of disposition, we have elected to deconsolidate the appeals and write separate opinions.

Before Judges STERN, WEFING and STEINBERG.

*Herbert D. Hinkle,* argued the cause for appellant.

*Beth Leigh Mitchell,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Ms. Mitchell,* on the brief).

The opinion of the court was delivered by

STEINBERG, J.A.D.

Petitioner J.D., by his guardian D.D.H., appeals from a final decision of the Director of the Division of Developmental Disabilities (DDD) denying J.D.'s requests for immediate residential services and a hearing. We affirm.

J.D. is presently thirty-two years old, having been born on November 29, 1967. Unfortunately, he has been severely mentally retarded since birth, and also suffers from a neurological impairment, epilepsy, seizures, and a history of hyperactivity. Additionally, he has developmental disabilities limiting his language, learning, self-direction and capacity for independent living. He sometimes hits and kicks, is verbally abusive, and engages in destructive behavior. D.D.H. is J.D.'s mother, and is approximately seventy-six years old.

J.D. was initially placed by the New Jersey Division of Youth and Family Services (DYFS) at the Woods School in Langhorne, Pennsylvania, in 1975. According to D.D.H., in 1981, DYFS advised her that it intended to terminate services and recommended that she apply to DDD. D.D.H. then applied for services and was advised that J.D. had been placed on a non-urgent category of the skill development home waiting list since it was determined that J.D. was not in need of institutional placement.[2] In 1982, D.D.H. placed J.D. in a residential program at St. Coletta

---

[2] From the record supplied to us, we are unable to determine if the decision to place J.D. on the skill development home waiting list, rather than institutional placement, has ever been challenged.

School in Jefferson, Wisconsin. She has funded the cost of the program.

In December 1985, DDD communicated with all families on the non-urgent waiting list to review their status. On February 4, 1986, D.D.H. called J.D.'s case manager and advised him that J.D. resided at St. Coletta. The parties disagree as to the balance of the telephone conversation. According to DDD, D.D.H. said that J.D. did not require DDD's services and asked to remove J.D. from the waiting list. Indeed, Nick Montegna, J.D.'s case worker, by letter dated February 11, 1986, advised D.D.H. as follows:

Pursuant to our phone discussion on February 4, 1986, I have closed [J.D.'s] file with the agency.

If you need information or services for [J.D.] in the future, please do not hesitate to call.

Although in her appellate brief, D.D.H. claims that DDD decided to close the case, it is significant to note that in her Statement of Facts supplied in her request for a hearing, she made no reference to the February 4, 1986 telephone conversation. Indeed, the Statement of Facts contains no allegation that DDD unilaterally decided to close the case. Moreover, Montegna's case notes indicate that D.D.H. "does not want services".

In 1994, D.D.H. contacted Montegna and advised him that she could no longer afford to pay for St. Coletta and requested financial assistance. We are unable to determine from the record what transpired, since Montegna's notes, contained in D.D.H.'s appendix, are illegible. However, we do know that on July 19, 1996, DDD placed J.D. in the urgent category for residential placement, apparently because his mother was over age fifty-five. By letter dated July 24, 1996, DDD notified D.D.H. that J.D. had been placed on the waiting list and categorized as urgent, but pointed out that there could be a delay in providing services due to unavailable financial resources.

On November 18, 1996, D.D.H.'s attorney wrote DDD advising that, in his opinion, DDD's failure to provide J.D. services was in violation of state and federal laws. In that letter, counsel request-

ed "a hearing pursuant to *N.J.A.C.* 10:48". The relief sought was "appropriate residential placement, such other relief as may be appropriate, and reimbursement for attorney fees and costs". The letter also provided, as follows:

> Additionally, I believe that your staff should have determined that an emergency exists in this situation because if [J.D.] were at home, [D.D.H.] would not be able to care for her son safely and appropriately on an extended basis. The failure to find an emergency also violates the aforementioned laws.

The Director of DDD (Director) replied by letter dated December 3, 1996, setting forth his understanding of the material facts and advising counsel that, at that time, there were approximately 1500 persons assigned to the urgent category. He further advised petitioner's counsel that it did not appear there would be sufficient funding available to place J.D. in the fiscal years 1997 or 1998. The Director expressed his opinion that the material facts were not in dispute and denied the request for a hearing. However, he offered to schedule a meeting with the Regional Administrative Practice Officer in order to afford counsel the opportunity to present additional facts. The letter concluded as follows:

> Following the meeting, I will reevaluate the situation based upon the information you provided. If I determine that there are still no facts in dispute, I will take final action in this matter. It is possible that following the meeting, I may determine that there are factual matters in dispute requiring the application of the administrative appeals process or that exceptional circumstances have been presented which necessitate placement prior to those individuals who have been assigned to the Urgent Category longer. Facts may also be presented at the meeting which cause the Division to determine that an emergency need for placement exists. (footnote omitted). If this occurs, emergency placement will be offered pursuant to *N.J.A.C.* 10:46B–3.3.
>
> If you choose not to participate in a meeting with the Regional Administrative Practice Officer, I will take final action on your request based upon the facts previously provided by you to the Division.

Rather than request a meeting with the Regional Administrative Practice Officer, five months later, counsel submitted a "Statement of Facts". In that Statement of Facts, counsel alleged that J.D. "had met both DDD's criteria for being in need of residential services on an emergency basis and urgently in need of residential services"; "DDD [had] placed residentially at public expense all of its clients who were determined either urgently in

need of residential services or in need of residential services on a residential basis (a) since the time of [J.D.]'s initial application for residential services", and (b) since DDD determined J.D. was urgently in need of residential services; DDD had discretion to use some of the funds appropriated to it for residential placements to pay for J.D.'s placement at St. Coletta; and, in addition to the budgetary appropriation for residential placements, DDD had other funds to pay for the placement. Counsel submitted the Statement of Facts "in protest" because he had been denied discovery and a hearing. In a comprehensive fourteen-page opinion, the Director concluded that there were no material facts in dispute requiring an evidentiary hearing and denied the request to transmit the dispute to OAL for an evidentiary hearing. He also denied J.D.'s claim for immediate residential placement.

D.D.H. and J.D. appeal, raising the following arguments: (1) the Director's decision denies J.D. statutorily mandated services; (2) the Director's refusal to provide a hearing before a neutral fact-finder denied them due process of law; (3) the Director's decision is arbitrary and capricious, and (4) as a remedy this court should order placement at St. Coletta retroactive to May 1996.

We affirm substantially for the reasons set forth by the Director in his comprehensive, well-reasoned decision dated January 2, 1998. We add the following comments.

Our scope of review of the action of an administrative agency is limited. *Brady v. Board of Rev.*, 152 *N.J.* 197, 210, 704 *A.2d* 547 (1997). We may reverse only if we conclude that the decision of the administrative agency is arbitrary, capricious or unreasonable, or is not supported by substantial credible evidence in the record as a whole. *In Re Taylor*, 158 *N.J.* 644, 657, 731 *A.2d* 35 (1999); *Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 588, 538 *A.2d* 794 (1988); *Outland v. Board of Trustees*, 326 *N.J.Super.* 395, 399, 741 *A.2d* 612 (1999).

DDD must provide eligible individuals "with appropriate functional service to the extent available." *N.J.S.A.* 30:4–25.6. In addition, when the most appropriate service is unavailable, DDD

must provide alternate services. *Ibid.* When appropriate services are not available, DDD must place the eligible individual on a waiting list for services. *Ibid.* By using the phrase "to the extent available", the Legislature contemplated that fiscal constraints may delay provision of services. This case presents the dilemma of competing claims for limited financial resources. We sympathize with J.D. and D.D.H. Nevertheless, we also recognize that DDD is faced with the daunting and unenviable task of attempting to provide for a large number of clients with inadequate funding for placement of all those in need of services.[3] In order to establish standards and criteria for the placement of eligible persons, DDD has promulgated a comprehensive set of regulations providing guidelines for placement. *N.J.A.C.* 10:46B–1.1 to –5.1. Moreover, in order to establish criteria and procedures for allocating limited residential and day program resources based on the relative needs of individuals waiting for community services, DDD has adopted regulations, which include waiting list procedures. *N.J.A.C.* 10:46C–1.1 to –1.14. The waiting list system consists of three categories: urgent, non-urgent, and not requested at this time. *N.J.A.C.* 10:46C–1.4(d). If exceptional circumstances are present, an eligible person may be placed ahead of others who have been waiting longer. *N.J.A.C.* 10:46B–4.1(e). Moreover, the regulations permit emergency placements when the person is homeless or in imminent peril. *N.J.A.C.* 10:46B–3.3(a). When DDD determines the need for an emergency placement, the individual must be offered a placement which can meet his or her basic needs. *N.J.A.C.* 10:46B–3.3(b).

*N.J.A.C.* 10:46B–1.3 provides the following definitions:

---

[3] Indeed, in his opinion, the Director notes that as of the time the decision was rendered there were approximately 2,580 individuals assigned to the urgent category of the waiting list. DDD's budget to provide services to those individuals currently receiving services in developmental centers, and all residential, day and support programs in community services was $729,378,000. When the waiting list in the urgent category had approximately 1,667 individuals, DDD had calculated the cost to provide immediate residential services to those on the waiting list to be $91,900,000. We have no reason to doubt those conclusions.

"Basic needs" means, food, shelter and personal safety.

\* \* \*

"Homeless" means that the person has no place to live or the person's living arrangement will end on a date certain within thirty days and he or she has no other living arrangements after that date.

\* \* \*

"Imminent peril" means a situation which could reasonably be expected to cause serious risk to the health, safety or welfare of the individual receiving services or another person in the current living arrangement. Imminent peril does not exist if the Division can put supports into the living arrangement which eliminate the serious risk to the individual.

Petitioner does not challenge DDD's development and maintenance of a waiting list for residential services, or the manner in which individuals are assigned to or removed from that waiting list. Petitioner contends that J.D. was entitled to an emergency placement. However, there was no contention that J.D. had no place to live or that his living arrangements would end on a date certain within thirty days and had no other living arrangements after that date. Accordingly, he was not homeless. *N.J.A.C.* 10:46B–1.3. In addition, he was not in a situation which could reasonably be expected to cause serious risk to his health, safety or welfare in his current living arrangement. *Ibid.* He was living at St. Coletta, and petitioner alleged no dissatisfaction or concern with his then-living conditions, nor did petitioner allege that he would become homeless on a date certain. Simply put, he was not homeless or in imminent peril and was therefore not entitled to an emergency placement. *Ibid.; N.J.A.C.* 10:46B–3.3(a).

We reject petitioner's contention that the facts of this case required DDD to provide alternate services to J.D. We have previously noted that *N.J.S.A.* 30:4–25.6 requires DDD to provide alternate service when the most appropriate service is not immediately available. However, at all times, petitioner indicated that she was pleased with the arrangements for J.D. at St. Coletta and

never requested alternate services. We disagree with petitioner's contention that *P.F. v. New Jersey Div. of Developmental Disabilities,* 139 *N.J.* 522, 527–29, 656 *A.*2d 1 (1995) required DDD to provide immediate services to J.D. There, unlike here, DDD proposed transferring P.F., who was already receiving services, from one residential facility in which he was thriving, to another residential facility which would not be in his best interest. Here, unlike P.F., there was no present intention to transfer.

■ The Director determined that petitioner's Statement of Facts essentially challenged a policy determination with respect to DDD's management of its waiting list and administration of its limited fiscal resources and the challenge did not arise from disputed facts, but rather from petitioner's dissatisfaction with the manner in which DDD implements its statutory mandate and, therefore, denied the application for a "plenary hearing". Accordingly, he denied the application to transmit the matter to the Office of Administrative Law (OAL) as a contested case. The Director also rejected petitioner's request for immediate residential services since most of the other individuals currently on the Urgent Category waiting list had been waiting as long as J.D. for residential services, and J.D. was residing at St. Coletta, albeit at the expense of D.D.H. Citing a need for DDD to use its limited resources to address the needs of those who have waited longer than J.D., the Director denied the request "to ignore the waiting list procedure [DDD] has so carefully crafted, with public input and comment, to be equitable and uniform, and allow J.D. to 'leap frog' ahead of hundreds of other individuals also assigned to the Urgent Category". He determined that to permit J.D. to "move ahead of other individuals waiting for residential services without statutory or regulatory justification would be arbitrary and capricious and violate the regulatory framework established by the Division".

In that context, we consider petitioner's contention that the Director should have transmitted the case to OAL as a contested case. A contested case is commenced in the State agency with

appropriate subject matter jurisdiction. *N.J.A.C.* 1:1–3.1. After an agency proceeding has commenced, the agency head must determine whether the matter is a contested case. *N.J.A.C.* 1:1–4.1. The OAL acquires jurisdiction over a matter only after it has been determined to be a contested case by an agency head. *N.J.A.C.* 1:1–3.2. A case is contested if it is "a proceeding . . . in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right, or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing". *N.J.S.A.* 52:14B–2(b).

However, not every factual dispute need be referred to OAL as a contested case. "The right to a full trial-type hearing in administrative proceedings is generally limited to the situation where adjudicatory facts that is, facts that pertain to a particular party are in issue." *High Horizons Dev. v. Department of Transportation,* 120 *N.J.* 40, 49, 575 *A.*2d 1360 (1990) (citations omitted). It is the presence of disputed adjudicative facts, not the vital interests at stake, that requires the protection of formal trial procedure. *Id.* at 53, 575 *A.*2d 1360. The mere existence of disputed facts is not conclusive. *Frank v. Ivy Club,* 120 *N.J.* 73, 98, 576 *A.*2d 241 (1990), *cert. denied, sub. nom. Tiger Inn v. Frank,* 498 *U.S.* 1073, 111 *S.Ct.* 799, 112 *L.Ed.*2d 860 (1991). An agency must grant a plenary hearing only if material disputed adjudicative facts exist. *Ibid.* Here, we conclude that bald allegations or naked conclusions such as those asserted by petitioner are insufficient to require an agency head to transmit the matter to OAL as a contested case. In its present posture we do not consider this dispute to be a placement appeal challenging DDD's decision to change the client's placement requiring transmittal to OAL as a contested case. *See J.E. on Behalf of G.E. v. State,* 131 *N.J.* 552, 568–71, 622 *A.*2d 227 (1993). In *J.E,* the client had been placed at public expense, initially by the Division of Youth and Family Services, and then by the local Board of Education. There, DDD intended to relocate the client from a

residential placement where he had been thriving for nearly thirteen years to a local developmental center. Our Supreme Court held that in order to provide adequate due-process protection of the statutory right to the most appropriate placement, a placement dispute involving interests such as those presented on that appeal must be referred to OAL for a trial-type hearing. *Id.* at 571, 622 *A.*2d 227. Again, this dispute does not involve a challenge of a proposed decision to transfer. In addition, here, the Director did not cavalierly ignore petitioner's request for a hearing. The Director merely concluded that, in his opinion, a request for transmittal to OAL was premature. He initially offered petitioner the opportunity to meet with a subordinate in order to afford petitioner the opportunity to present additional facts which might lead him to believe that there were factual matters in dispute requiring referral to OAL, or that exceptional circumstances had been presented which necessitated placement prior to those individuals who had been assigned to the Urgent Category longer or, alternatively, that an emergency existed. Unfortunately, petitioner failed to avail herself of that opportunity.

The Director's offer was tantamount to an offer of an informal conference. *N.J.A.C.* 10:48–1.5 contemplates informal conferences as a preliminary step in a non-contested case. The client is entitled to be represented by retained legal counsel at the informal conference. *N.J.A.C.* 10:48–1.5(a)4. If resolution is not achieved at the informal conference level a request may be made for administrative review with the parties present, or a paper review without the parties appearing. *N.J.A.C.* 10:48–1.5(b)2. There is a right to retain counsel, *N.J.A.C.* 10:48–1.5(d)2. If the administrative review is conducted with appearances, a verbatim tape recording of the proceeding is made. *N.J.A.C.* 10:48–1.5(d)4. Moreover, there is a limited right to discovery in accordance with *N.J.A.C.* 10:41–2. *See N.J.A.C.* 10:48–1.5(c)3; *N.J.A.C.* 10:48–1.5(d)6. In addition, *N.J.A.C.* 10:48–1.5(d)8ii provides for testimony and cross-examination at this next stage, the administrative review. Finally, there is a right of appeal to this court. *N.J.A.C.* 10:48–1.5(c)7; *N.J.A.C.* 10:48–1.5(d)12.

We have set out the procedure in some detail to demonstrate that it is the result of a comprehensive set of regulations designed to encourage amicable resolution in a non-confrontational setting. Indeed, *N.J.A.C.* 10:48–1.3(d) even requires a settlement conference prior to transmittal of a contested case to OAL. These procedures are designed to encourage communication in a non-adversarial setting affording the parties an opportunity to explore the possible reconciliation of their differences. In *J.E.* the Supreme Court endorsed the use of informal conferences as a means of facilitating and encouraging the early resolution of disputes. *J.E., supra,* 131 *N.J.* at 569, 622 *A.*2d 227. In addition, even if differences are not resolved, there is an opportunity to narrow the issues so as to avoid the need for expensive, protracted hearings.

Unfortunately, this case has become not only adversarial, but, we detect from the briefs and oral argument, also contentious. That is unfortunate. We appreciate petitioner's attorney's zeal in striving to obtain the best result for his client. In addition, we understand petitioner's apparent frustration in not receiving immediate relief due to inadequate funding. Nevertheless, we also appreciate DDD's difficult mission in attempting to weigh and evaluate the competing demands for limited financial resources. After all, DDD must achieve the greatest good for the greatest number of its clients. *P.F. v. New Jersey Div. of Disabilities, supra,* 139 *N.J.* at 531, 656 *A.*2d 1 (1995).

We conclude that the Director's initial decision not to transmit the matter to OAL as a contested case based solely upon the naked conclusions set forth in the Statement of Facts was reasonable, particularly in light of the fact that he offered to treat the matter informally and afford petitioner an opportunity to present additional evidence to warrant submission as a contested case. His decision to treat the matter in that fashion was neither arbitrary, capricious nor unreasonable. We recognize that we need not defer to legal determinations made by an administrative agency since the agency has no expertise to decide purely legal

issues. *SSI Medical Services, Inc. v. State Department of Human Services,* 146 *N.J.* 614, 621, 685 *A.*2d 1 (1996); *Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). Our review of legal decisions of an administrative agency is *de novo, SSI Medical Services, supra,* 146 *N.J.* at 621, 685 *A.*2d 1. To the extent the decision not to transmit the matter to OAL may be considered legal in nature necessitating *de novo* review, we do not hesitate to express our agreement with it. Bald conclusions such as those alleged in the Statement of Facts should not necessitate an automatic transmittal to OAL.[4]

Although we affirm the decision of the Director, we encourage the parties to attempt to meet to resolve their differences.

Affirmed.

---

[4] Without addressing the issue, we also note that a plenary hearing essentially directed to ones placement on the waiting list may require examination of the file of every client on the waiting list. Such an examination would necessarily interfere with legitimate privacy rights of those individuals. We further note the possibility that every client on the waiting list might be entitled to notice, and an opportunity to be heard, since the object of the proceedings would be to move ahead of them on the waiting list. In an appropriate case these issues may have to be addressed.