69 A.3d 143

IN THE MATTER OF J.S.

Superior Court of New Jersey
Appellate Division

Argued March 22, 2013—Decided June 21, 2013.

Before Judges AXELRAD, SAPP–PETERSON [1] and HAAS.

*Evelina E.G. Padilla* argued the cause for appellant J.S. (*Hinkle, Fingles & Prior,* attorneys; *Ms. Padilla* and *S. Paul Prior,* on the brief).

*Gene Rosenblum,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Human Services, Division of Developmental Disabilities (*Jeffrey S. Chiesa,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Ms. Rosenblum,* on the brief).

The opinion of the court was delivered by

AXELRAD, P.J.A.D.

The parents of J.S., a developmentally disabled adult who was in an out-of-state private residential placement, appeal from a final decision of the New Jersey Department of Human Services, Division of Developmental Disabilities (DDD), declining to place her name on the priority waiting list (PWL) retroactive to April 15, 1996. Appellants contend the DDD had an affirmative obligation to individually notify them of the change in the regulations that occurred in 1996, after J.S. had been assigned to the non-urgent waiting list category, which rendered J.S. eligible for placement on the PWL. They argue that as a remedy for the agency's failure, J.S. should be placed on the PWL retroactive to the date of the regulation rather than as of January 7, 2004, the date they requested the priority assignment. Appellants also challenge the DDD's decision to treat the matter as a non-contested case. They additionally seek attorneys' fees and costs of litigation. Based on our analysis of the record and applicable law, including our deference to the agency's interpretation of its regulations, we are not convinced the DDD was legally obligated

---

[1] Judge Sapp–Peterson did not participate in oral argument. However, the parties consented to her participation in the decision.

to affirmatively provide such individual notice or that it acted arbitrarily or capriciously warranting judicial intervention.

## I.

J.S. is a forty-seven year old developmentally disabled woman who is severely cognitively impaired as a result of a brain injury. She is non-verbal and functions as a four-year old. Beginning in 1984, appellants privately placed her at Riverbrook residential program in Stockbridge, Massachusetts. The placement was funded initially by the school district and then by appellants.

By letter of January 10, 1995, the DDD advised appellants that J.S. was deemed eligible for services and placed her on a non-urgent (non-priority) "category 3"—"case management and community housing waiting list." Appellants did not challenge the placement. *See N.J.A.C.* 10:46C–1.8(a).[2] Because J.S. was placed privately outside New Jersey and appellants did not request any additional services, the DDD did not provide an Individualized Habitation Plan (IHP) for her. *See N.J.S.A.* 30:6D–10 (requiring the agency that is "primarily responsible for the delivery or for coordinating the delivery of services" for persons with developmental disabilities to develop an IHP); *N.J.S.A.* 30:6D–12 (providing for a plan coordinator to conduct an annual review of the IHP with such person's parents or representative); *see also N.J.A.C.* 10:46C–1.3 (defining IHP).

In 1996 the DDD's regulations changed, requiring the DDD to provide families with the opportunity to place their children on the PWL once the younger parent turned fifty-five years of age. *See N.J.A.C.* 10:46C–1.8(a) ("When both parents . . . reach age 55, they shall be given the option to have the individual placed on the urgent waiting list at the time of the annual IHP."); *N.J.A.C.* 10:46C–1.8(b) ("If the parent(s) does not choose to have the individual placed on the urgent waiting list, the parent(s) shall be

---

2 This regulation was recodified as *N.J.A.C.* 10:46C–2.7. *R.* 2012 *d.* 161, eff. Sept. 17, 2012.

given an option to place the individual on the waiting list no less than annually at the time of the IHP."); 28 *N.J.R.* 2614(a), eff. April 15, 1996.[3]

From 1996 to 2003 appellants had no contact with the DDD. In December 2003, appellants inquired by telephone about placing J.S. on the PWL, and on January 7, 2004, they submitted a written application for placement. A January 20, 2004 letter from the DDD to appellants confirmed that J.S. was approved for a Community Services Residential Arrangement and was placed in the priority category effective January 7, 2004. The letter further advised of the appeal procedure. Appellants did not then object to the effective date.

In 2005, appellants contacted the DDD case manager seeking assistance with the financial obligations at Riverbrook but were advised that funds were not available. At that time both appellants were over sixty-five years of age.

In a December 7, 2009 letter, appellants' counsel first requested the DDD place J.S. on the PWL for residential services retroactive to April 15, 1996, the effective date of *N.J.A.C.* 10:46C–1.8, after J.S. became eligible and was assigned to the non-urgent waiting list category. The letter advised that J.S.' youngest parent had turned fifty-five in December 1994, and contended the DDD had an obligation to advise her family of the priority option available to it under the new regulation at the time of its enactment.

On January 22, 2010, the DDD advised that the request was going to be treated as a non-contested matter, *N.J.A.C.* 10:48–3.1, and held an informal conference on May 12, 2010. On December 6, 2010, appellants and eight other families filed a complaint for declaratory and injunctive relief in the Chancery Division, Mercer

---

[3] The regulation was readopted upon expiration on April 10, 2001, without change. 33 *N.J.R.* 1378(a). The regulation was then repealed and readopted as *N.J.A.C.* 10:46C–2.2(a) in substantially similar form. *R.* 2012, *d.* 161, eff. September 17, 2012.

County, seeking to compel the agency to transmit their administrative appeals to the OAL for contested case hearings. By order of February 22, 2011, the Chancery Division granted the DDD's motion to transfer the case to the Appellate Division. *R.* 2:2–3(a)(2). By order of September 6, 2011, we denied appellants' motion for summary disposition, and by order of December 8, 2011, we granted the DDD's motion to remand to the agency to issue final decisions addressing the merits of the appeals.

In the interim, on August 19, 2011, the DDD released its informal conference report adverse to appellants. Appellants advised the DDD they wished to further pursue the appeal. The DDD offered appellants an administrative paper review pursuant to *N.J.A.C.* 10:48–4.3, and appellants submitted written arguments. On January 20, 2012, DDD's administrative review officer issued a recommended decision finding J.S. was properly placed on the PWL with an effective date of January 7, 2004. Appellants filed exceptions.

On March 9, 2012, the DDD issued a final agency decision concluding J.S. was properly assigned to the PWL effective January 7, 2004, rather than retroactively to April 15, 1996, and the determination was not arbitrary or capricious. Acting Assistant Commissioner (AAC) Dawn Apgar reasoned that: (1) appellants were given the opportunity to place J.S. on the PWL in 1995, and declined because she was in a private placement; (2) because appellants did not request any additional services for J.S. beyond those they were already privately providing for her at Riverbrook, the DDD did not have primary responsibility to provide services to her within the meaning of *N.J.S.A.* 30:6D–10, and did not provide an IHP for her; (3) appellants could have requested placement on the PWL at any time and were not prevented from doing so by the DDD; in fact, as soon as they requested that category, the DDD reviewed and approved the request because the agency determined J.S. was at significant risk; and (4) to give J.S. a PWL date of April 15, 1996, would be contrary to the agency's Waiting List Procedure. AAC Apgar also found the

matter was a non-contested case that did not warrant transfer to the OAL for three reasons: (1) it did not involve an appeal of determinations of ineligibility for services, appeals of specific offers of placement, or appeals of waiver-funded services under the agency's appeal procedure, *N.J.A.C.* 10:48–2.2; (2) there were no disputes of material facts; and (3) there was no constitutional requirement for a trial-type hearing.

This appeal ensued. Appellants assert the following arguments:

*POINT I*

THE [DDD'S] ACTIONS ARE ARBITRARY AND CAPRICIOUS AND VIO-LATE[ ] [J.S.'] RIGHT TO EQUAL PROTECTION UNDER THE FEDERAL AND NEW JERSEY CONSTITUTIONS.

A. DDD'S DECISION NOT TO ADD [J.S.'] NAME TO THE [PWL] AS OF 1996 SHOULD BE REVERSED BECAUSE DDD CONCEDEDLY FAILED TO OFFER THE FAMILY THE OPTION OF PLACING [HER] NAME ON THE [PWL] IN 1996 AND EVERY YEAR THEREAFTER.

B. DDD'S DECISION NOT TO OFFER [J.S.] PLACEMENT ON THE [PWL] AS OF 1996 VIOLATES [J.S.'] RIGHT TO EQUAL PROTECTION UNDER THE FEDERAL AND NEW JERSEY CONSTITUTIONS.

*POINT II*

ALTERNATIVELY, THIS MATTER SHOULD BE TREATED AS CONTEST-ED AND TRANSFERRED TO THE [OAL].

A. THIS IS A CONTESTED CASE BECAUSE THERE ARE MATERIAL ADJUDICATIVE FACTS IN DISPUTE.

B. [APPELLANTS] HAVE A CONSTITUTIONAL RIGHT TO A HEARING BECAUSE OF THE SIGNIFICANT INTEREST AT STAKE AND INADE-QUACY OF PROCEDURES OFFERED BY DDD.

1. [Appellants'] private interest at stake is of significant magnitude because DDD failed to place J.S.' name on the [PWL] as of 1996 to which she is entitled.

2. With the inadequate administrative procedures offered by DDD, the risk of erroneous deprivation is high and employing the protections associated with a hearing would significantly reduce that risk.

3. The additional procedures are not unduly burdensome on the State.

*POINT III*

[APPELLANTS] ARE ENTITLED TO REIMBURSEMENT FOR ATTOR-NEY'S FEES AND COSTS OF LITIGATION BECAUSE OF DDD'S FAILURE TO FULFILL ITS STATUTORY OBLIGATIONS COUPLED WITH EXCES-

SIVE DELAYS WHICH DENIED [APPELLANTS] THE DUE PROCESS OF LAW.

We are not persuaded by these arguments and affirm.

## II.

Our scope of review of an administrative agency's final determination is limited. *In re Carter,* 191 *N.J.* 474, 482, 924 *A.*2d 525 (2007). We "may reverse only if we conclude that the decision of the administrative agency is arbitrary, capricious or unreasonable, or is not supported by substantial credible evidence in the record as a whole." *J.D. v. N.J. Div. of Developmental Disabilities,* 329 *N.J.Super.* 516, 521, 748 *A.*2d 613 (App.Div.2000) (citations omitted).

"The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action." *In re Arenas,* 385 *N.J.Super.* 440, 443–44, 897 *A.*2d 442 (App.Div.), *certif. denied,* 188 *N.J.* 219, 902 *A.*2d 1236 (2006). *See also Barone v. Dep't of Human Servs., Div. of Med. Assistance & Health Servs.,* 210 *N.J.Super.* 276, 285, 509 *A.*2d 786 (App.Div.1986), *aff'd,* 107 *N.J.* 355, 526 *A.*2d 1055 (1987).

Administrative regulations are subject to the same rules of construction as statutes. *Essex Cnty. Welfare Bd. v. Klein,* 149 *N.J.Super.* 241, 247, 373 *A.*2d 691 (App.Div.1977). A regulation should be "construed in accordance with the plain meaning of its language ... and in a manner that makes sense when read in the context of the entire regulation." *Medford Convalescent & Nursing Ctr. v. Div. of Med. Assistance & Health Servs.,* 218 *N.J.Super.* 1, 5, 526 *A.*2d 1087 (App.Div.) (internal citation omitted), *certif. denied,* 102 *N.J.* 385, 508 *A.*2d 247 (1985). In interpreting a regulation, a reviewing court should give deference to the views of the administrative agency that implements the determinations. *Barone, supra,* 210 *N.J.Super.* at 285, 509 *A.*2d 786.

■ Where an agency's expertise is a factor, we defer to that expertise, particularly in cases involving technical matters within the agency's special competence. *In re Freshwater Wetlands Prot. Act Rules*, 180 *N.J.* 478, 488–89, 852 *A.2d* 1083 (2004). This deference is even stronger when the agency "has been delegated discretion to determine the specialized and technical procedures for its tasks." *City of Newark v. Natural Res. Council in the Dep't of Envtl. Prot.*, 82 *N.J.* 530, 540, 414 *A.2d* 1304, *cert. denied*, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.2d* 245 (1980). Moreover,

[w]hen an administrative agency interprets and applies a statute it is charged with administering in a manner that is reasonable, not arbitrary or capricious, and not contrary to the evident purpose of the statute, that interpretation should be upheld, irrespective of how the forum court would interpret the same statute in the absence of regulatory history.

[*Reck v. Dir., Div. of Taxation*, 345 *N.J.Super.* 443, 448 [785 *A.2d* 476] (App.Div. 2001), *aff'd*, 175 *N.J.* 54 [811 *A.2d* 458] (2002) (quotation marks and citation omitted).]

## III.

■ The crux of appellants' argument is that *N.J.A.C.* 10:46C–1.8 imposed on the DDD an affirmative duty to advise of the new regulation and thus afford families the option to place eligible individuals on the PWL when the age fifty-five criteria was established in 1996 and every year thereafter. They urge that when the DDD fails to comply with its affirmative obligation to place its clients on the PWL according to the mandated procedures, it violates the agency's governing statute, and effectively denies its clients services to which they are entitled.

Specific to J.S., appellants contend the DDD acted arbitrarily and capriciously by failing to make any contact with them for nine years and not advising them of the option to have J.S. placed on the PWL, for which she would have qualified in 1996 as her father was then over fifty-five years of age. Appellants represent they most certainly would have availed themselves of this option had they been given it, and would not have waited until January 2004 to make the request for a priority placement. Appellants urge that it would be an injustice to permit the DDD to act arbitrarily

and fail to carry out its affirmative obligation by placing J.S. on the PWL nearly eight years after she was entitled to placement, which results in a substantial further delay of the agency's responsibility to provide residential services to J.S.

Appellants further argue that by failing to offer J.S. placement on the PWL as of 1996, the DDD treated her differently than similarly situated disabled persons whose younger parent turns fifty-five years of age, violating her right to equal protection under the State and Federal Constitutions. *See, e.g., Sanchez v. Dep't of Human Servs.*, 314 *N.J.Super.* 11, 713 *A.*2d 1056 (App.Div.1998) (holding that the program which created a two-tier welfare system in which a person seeking welfare benefits who had moved to New Jersey from a state that offered a lower level of benefits would receive lower benefits during their first year of residency in New Jersey than would a person who had lived here for twelve consecutive months violated the equal protection clauses of the State and Federal Constitutions).

We disagree. We first query whether appellants' 2009 challenge to the January 7, 2004 date of priority placement is time-barred. Appellants were notified of that date by letter of January 20, 2004, which also provided the appeal procedure. Appellants took no action at that time. It was not until they retained counsel, who sent a letter to the DDD almost six years later, that they requested the retroactive relief. However, as the DDD did not make that argument and chose to address and reject appellants' 2009 request on the merits, we will likewise do so.

Appellants' argument has a certain visceral appeal, as the delay in J.S.' priority status is unfortunate. Although it would have been preferable for the DDD to have notified appellants and similar families who did not participate in an annual IHP review about the change in regulations, we are not convinced the DDD was legally obligated to affirmatively provide such individual notice. In view of our deference to the agency's establishment of its procedures and interpretation of its regulations, nor are we convinced the DDD acted arbitrarily or capriciously warranting judi-

cial intervention. *See N.J. Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 563, 384 *A*.2d 795 (1978) (reiterating that courts should not substitute their judgment about the wisdom of an administrative action for that of the agency provided the "action is statutorily authorized and not otherwise defective because arbitrary or unreasonable"); *Flanagan v. Dep't of Civil Serv.*, 29 *N.J.* 1, 12, 148 *A*.2d 14 (1959) ("If there is any fair argument in support of the course taken [by the agency] or any reasonable ground for difference of opinion among intelligent and conscientious officials, the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal.").

The Legislature has entrusted the DDD with the responsibility to provide services to an eligible individual with developmental disabilities designed to maximize his or her potential, and has authorized the agency to promulgate regulations to carry out this mandate. *N.J.S.A.* 30:6D–27; *N.J.S.A.* 30:6D–5.6. In issuing these directives, the Legislature was mindful that the DDD does not have the available resources to provide the "most appropriate" services to every eligible individual, and thus required the DDD to provide services only "to the extent available." *N.J.S.A.* 30:4–25.6; *N.J.S.A.* 30:6D–27(a). When the most appropriate service is not available, the DDD may provide an alternate service and place the eligible individual on a waiting list for his or her preferred service. *Ibid.*

"By using the phrase 'to the extent available,' the Legislature contemplated that fiscal constraints may delay provision of services." *J.D., supra*, 329 *N.J.Super.* at 522, 748 *A*.2d 613. With competing claims for limited financial resources, we have recognized that the DDD "is faced with the daunting and unenviable task of attempting to provide for a large number of clients with inadequate funding for placement of all those in need of services." *Ibid.* (footnote omitted). *See also S.I. v. N.J. Div. of Developmental Disabilities*, 265 *N.J.Super.* 251, 264, 626 *A*.2d 466 (App.Div. 1993) ("Where the Legislature creates a class of beneficiaries which is greater than that which can be served by the amount of

resources available for that purpose, and is silent on how to resolve the predicament, then the administrative agency may establish reasonable classifications and priorities to allocate these limited resources.").

In furtherance of its statutory duties, the DDD promulgated regulations establishing criteria and procedures for allocating its limited services based on the relative needs of the individuals awaiting those services. *See N.J.A.C.* 10:46C. The regulations establish waiting lists because the availability of the DDD's services is limited to its funding in a given fiscal year. The waiting list regulations prioritize service needs when there are insufficient funds and allocate scarce resources among many individuals with similar needs and circumstances. *N.J.A.C.* 10:46C–1.1.

In 1995, when J.S. was deemed eligible for the DDD's services and placed on the Category 3, non-urgent waiting list, assignment to the waiting lists was governed by *N.J.A.C.* 10:46C–1.4, which established four categories of need from Category I (Urgently in Need) to Category IV (Residential Only). Category I considered the "age and health of the caregiver" and whether the individual "pose[d] a present risk of physical harm to self or others; [t]he individual [was] seriously regressing; or [t]he individual [was] at serious risk because of the imminent loss of the caregiver or because he or she [was] homeless, abused, or neglected." *N.J.A.C.* 10:46C–1.4.

The 1996 amended regulations, in part, permitted disabled individuals with parents over fifty-five years of age to move up on the waiting. list. *N.J.A.C.* 10:46C–1.4(d)(1)(iii) established that if both parents were fifty-five years of age, that "shall create a presumption that an individual is at significant risk." The urgent category waiting list was to be "assigned when the individual is in need of a placement because he or she is determined to be at significant risk." *N.J.A.C.* 10:46C–1.4(d)(1).

To assist families in determining whether to request placement on the urgent waiting list, the new regulations provided a mecha-

nism for informing them of their children's eligibility at the annual meetings. *N.J.A.C.* 10:46C–1.8 provided, in pertinent part:

(a) When both parents . . . reach age 55, they shall be given the option to have the individual placed on the urgent waiting list *at the time of the annual IHP.* In this instance, the date that the younger parent turns 55 shall be the date the individual is added to the urgent category.

. . . .

(b) If the parent(s) does not choose to have the individual placed on the urgent waiting list, the parent(s) shall be given an option to place the individual on the waiting list *no less than annually at the time of the IHP.*

(c) If the parent(s) decides not to put the individual on the urgent category at the time they reach age 55 but later chooses to add the individual, the individual shall be added on the urgent list according to the date the parent(s) makes the request in writing for assignment to the urgent category.

[ (Emphasis added).]

The record demonstrates that at the time of eligibility on January 10, 1995, J.S. was privately placed in Massachusetts and the DDD complied with its obligation to place J.S. on the non-urgent Category 3 waiting list. Appellants did not object to or otherwise appeal this designation. Moreover, appellants could have contacted the DDD case manager at any time prior to December 2003 and did not. Appellants also had the option to request that J.S. be added to the urgent waiting list but instead waited until the end of 2003, despite the public notice of the 1996 change in the DDD's regulation. *See In re PSE & G Co.'s Rate Unbundling,* 330 *N.J.Super.* 65, 132, 748 *A.2d* 1161 (App.Div.2000) ("The purpose of rulemaking is to give the public notice of anticipated agency action and an opportunity to participate and comment on the action before it becomes final as well as to give the agency the benefit of the information that the public has to offer.") (citing *Metromedia, Inc., v. Dir., Div. of Taxation,* 97 *N.J.* 313, 331, 478 *A.2d* 742 (1984)), *aff'd,* 167 *N.J.* 377, 771 *A.2d* 1163, *cert. denied,* 534 *U.S.* 813, 122 *S.Ct.* 37, 151 *L.Ed.*2d 11 (2001).

Additionally, during that time the DDD was not providing any services for J.S., let alone being "primarily responsible" for delivering or coordinating services for her. Thus, the agency did not provide an IHP for J.S. that was annually reviewed with a plan coordinator and appellants pursuant to *N.J.S.A.* 30:6D–12. The

agency, within its expertise and discretion, tied the mechanism for informing the families of the "option" of the priority placement and the exercise of that "option" to the "time of the annual IHP." Accordingly, the express language of *N.J.A.C.* 10:46C–1.8(a) and (b) did not impose on the DDD an affirmative obligation to advise appellants of the change in regulations.

Appellants have also failed to support their equal protection claim. *See Heller v. Doe,* 509 *U.S.* 312, 319, 113 *S.Ct.* 2637, 2642, 125 *L.Ed.*2d 257, 270 (1993) (holding that rational-basis review does not authorize courts to substitute their own judgment for the "wisdom, fairness, or logic" of governmental choices). The DDD promptly acted upon appellants' January 7, 2004 request for priority. In accordance with *N.J.A.C.* 10:46C–1.8(c), the agency assigned J.S. to the urgent waiting list category effective to that date. Thus, J.S. was afforded the priority to which she was entitled under law.

■ We also disagree with appellants that the administrative procedures offered by the DDD were inadequate and that they are entitled to an OAL hearing based on statute, regulation, or a constitutional right. *See N.J.A.C.* 10:48–2.2 (providing that contested cases include appeals of determinations of ineligibility for services, appeals of specific offers of placements, and appeals of waiver-funded services). For example, hearings are required for appeals of offers of placement because "expert witnesses would be expected to testify concerning the types of services best suited to the client's unique needs" and "witnesses would be likely to address the factors that determine which placement would best achieve the person's habilitative goals, and the level of restriction on the client's liberty that is dictated by the degree of handicap." *J.E ex rel. G.E. v. Dep't of Human Servs.,* 131 *N.J.* 552, 566, 622 *A.2d* 227 (1993). None of the enumerated situations are present here and there is no need for expert testimony.

■ Nor are we persuaded there are material facts in dispute that warrant an OAL hearing. "[N]ot every factual dispute need be referred to [the] OAL as a contested case." *J.D., supra,* 329

*N.J.Super.* at 525, 748 *A.*2d 613. Entitlement to a trial-type hearing in administrative proceedings "is generally limited to the situation where adjudicatory facts—that is, facts pertaining to a particular party—are in issue." *High Horizons Dev. Co. v. N.J. Dep't of Transp.*, 120 *N.J.* 40, 49, 575 *A.*2d 1360 (1990) (internal quotation marks and citations omitted). Adjudicative facts "usually answer the question of who did what, where, when, how, why, with what motive." *Ibid.* Furthermore, "[i]t is the presence of disputed adjudicative facts, not the vital interests at stake, that requires the protection of formal trial procedure." *J.D., supra,* 329 *N.J.Super.* at 525, 748 *A.*2d 613 (citing *High Horizons Dev. Co., supra,* 120 *N.J.* at 53, 575 *A.*2d 1360). The pertinent facts of the present case are not in dispute. As the matter solely involves the DDD's interpretation and implementation of its regulation, a hearing is unnecessary.

When the DDD determined the matter was non-contested, it properly offered an informal conference pursuant to *N.J.A.C.* 10:48–3.1(b), and adequate review of appellants' claims. Appellants were permitted to present new and additional information to support their positions at the informal conference, written arguments for the appeal, and exceptions to the recommended decision for the final agency decision. Although we do not countenance the DDD's delay in issuing its informal conference report, we discern no denial of due process in that regard.

We are not convinced the nature of the review and significant time for completion by the DDD violated the "principles of fundamental procedural fairness" or rendered its "proceedings as a whole" to result in a "seriously unfair disregard of appellant[s'] rights" to warrant reversal. *See In re Arndt,* 67 *N.J.* 432, 436–37, 341 *A.*2d 596 (1975) (reversing the appellant's six-month suspension of her driver's license based on the three-year delay between her refusal to submit to a breath chemical test and the issuance of a notice of proposed suspension). While appellants may be frustrated that the administrative review process lasted over two

years and disappointed in the final determination reached by the DDD, they cannot logically argue that the procedures were unjust.

Appellants do not have a constitutional right to a contested case hearing in this matter. We are satisfied the administrative appeal procedure offered by the DDD is adequate to protect J.S.' interest. *See Mathews v. Eldridge,* 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976) (holding that the risk of erroneous deprivation of that interest through the agency procedures used, and the probable value of additional or substitute procedural safeguards is one of the factors considered in assessing whether a hearing is constitutionally required).

Lastly, appellants argue they are entitled to reimbursement for attorney's fees and costs of litigation because they have demonstrated viable federal procedural due process claims based, in part, on the DDD's failure to transmit the appeal to the OAL as a contested case. *See* 42 *U.S.C.A.* § 1983; *Hosp. Ctr. at Orange v. Guhl,* 331 *N.J.Super.* 322, 338, 751 *A.*2d 1077 (App.Div.2000) (holding that "[a]ttorney's fees are recoverable in a § 1983 action if the plaintiffs prevail on a state law issue arising from the same nucleus of common facts as the federal claims, provided the federal claims are substantial enough to support federal jurisdiction") (citations omitted).

We have concluded the DDD properly declined to transmit this appeal to the OAL. We further concluded the agency did not violate appellants' due process rights and was neither arbitrary nor capricious in its handling of this matter. Accordingly, appellants are not entitled to reimbursement of fees and costs.

Affirmed.