**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1978-23

IN THE MATTER OF PROTEST
OF SISBARRO TOWING &
RECOVERY, LLC
REGARDING DENIAL OF
PREQUALIFICATION FOR THE
PERFORMANCE OF ROUTINE
TOWING SERVICES IN ZONE 10
OF THE GARDEN STATE
PARKWAY.

_____

Submitted March 19, 2025 – Decided June 30, 2025

Before Judges Currier and Paganelli.

On appeal from the New Jersey Turnpike Authority.

Fruchter & Associates, LLC, attorneys for appellant Sisbarro Towing & Recovery, LLC (Harvey Fruchter and Tyler J. Ford, law student, appearing pursuant to Rule 1:21-3(b), on the briefs).

DeCotiis, Fitzpatrick, Cole & Giblin, LLP, attorneys for respondent New Jersey Turnpike Authority (John Profita, on the brief).

PER CURIAM

Sisbarro Towing & Recovery LLC, (Sisbarro) appeals from the final agency decision of the New Jersey Turnpike Authority (Authority) rejecting its protest of the denial of its prequalification application.  Because Sisbarro raised due process arguments for the first time on appeal, we decline to consider those arguments.  Further, we conclude Sisbarro failed to establish the Authority's decision to reject its prequalification application was arbitrary, capricious or unreasonable.  We affirm.

We glean the procedural history and facts from the hearing record.  On August 16, 2022, the Authority issued a request for the "Prequalification of Contractors for Routine Towing Services on Various Areas of the New Jersey Turnpike and/or Routine Towing Services and Emergency Services on Various Areas of the Garden State Parkway."  According to the specification, "in order to submit a bid for Routine Towing Services and/or for Routine Towing Services and Emergency Services . . . interested towing contractors must first be prequalified pursuant to th[e] prequalification process."

As relevant here, the prequalification specification required:

D.  Garage Facility

1.  All repairs performed at the request of a patron must be performed by the Successful Bidder at the Garage Facility listed above for which this Application is

2

submitted.  Storage of vehicles must be at said Garage Facility.  Storage of vehicles shall be in a secure area defined as a facility that is indoors or is surrounded by a fence, wall or other man-made barrier that is at least six . . . feet high and is lighted from dusk until dawn to deter trespassers and or vandalism.  The Garage facility must be neat, clean, orderly, and well-maintained and clearly identified with a permanent sign bearing the Successful Bidder's name.

2.   The Garage Facility must contain at least . . . one major permanent structure and must contain at least one . . . clean and well-maintained restroom for patrons available 24 hours.  There must be clean and comfortable administrative offices and waiting area for patrons with a public and/or private telephone available 24 hours for patrons' use.  The restroom must have a working toilet, a sink with hot and cold water and with paper or mechanical means for drying hands.  **All public areas must be clean, sanitary and in good condition.**

. . . .

FOR ROUTINE TOWING SERVICES AND EMERGENCY SERVICES ON THE GARDEN STATE PARKWAY (only)

6. The Garage Facility must be capable of safely storing at least fifty . . . passenger vehicles and one . . . bus.  . . . **Satellite (off-site) storage yards will not be considered.  All storage must be at the Garage Facility listed on the**

3

**Application. Under no circumstances will patron[s'] vehicles be stored on city streets or in an unsecured location.**

Further, the specification stated:

> As part of the Prequalification process, Applicant's . . . facilities . . . are subject to inspection by Authority personnel and/or the New Jersey State Police. **Garage Facility Inspections will be unannounced**. It is the responsibility of the Applicant to demonstrate that the requirements of the Prequalification Application are satisfied within the Garage Facility.

Sisbarro submitted an application for prequalification. On January 19, 2023, the Authority conducted an inspection of Sisbarro's facility. On October 4, 2023, Janet Rzepka (Rzepka), Director of Procurement and Materials Management, wrote to Sisbarro:

> [I]t has been determined that Sisbarro . . . does not meet the minimum requirements set forth in the Prequalification Application and is therefore ineligible to submit a bid . . . .
>
> (a) Insufficient storage area, in violation of Section III, para. D1 and (b) Unsuitable access to restroom, in violation of Section III, pa[r]a. D2.
>
> Accordingly, Sisbarro['s] . . . Prequalification Application for routine towing services on the Parkway is denied. An applicant aggrieved by a decision as to its prequalification status may request, in writing, a hearing pursuant to a process outlined in Regulations of the Authority. . . .

4

On October 6, 2023, Sisbarro wrote that it was in "complete compliance" with "Section III, para. D1" in that it had "a six feet [eight-]inch . . . high chain link and stockade fence around the perimeter of the property" and "additional security measures well beyond the scope of what is required."

On January 23, 2024, John LaBella (LaBella), Director, Toll Collection of the Authority held a hearing to consider Sisbarro's challenge to the rejection. LaBella was "designated by the Executive Director to serve as the Hearing Officer."[1] At the hearing, the Authority was represented by its general counsel and William McDonough (McDonough), Manager of Emergency Services, Operations Department. Sisbarro was represented by its president and counsel. Before the start of the hearing, LaBella explained:

> This is an informal hearing. It is not a trial-type hearing. It is not an adversarial hearing. The rules of evidence do [not] apply. Witnesses will not be sworn, and there will be no cross-examination. There is a stenographer present to make a verbatim record of these proceedings.
>
> Initially I will hear the . . . Authority's representative regarding the basis upon which [Sisbarro]'s application for prequalification was denied. Thereafter, [Sisbarro']s representative will be heard.

---

[1] Under N.J.A.C. 19:9-2.12(b), "[u]pon the filing of a timely protest, the Executive Director or his or her designee shall have the authority, but not the obligation, to conduct a hearing . . . ."

Once I have heard from the . . . Authority staff and . . . [Sisbarro']s representative, the hearing will be concluded. A final written decision will be rendered shortly thereafter.

Any questions?

The following exchange occurred:

[Sisbarro's Counsel]: Well, if there will not be cross-examination, a question of general clarification w[ill] n[o]t be denied just to clarify any testimony that was given?

[LaBella]: Correct. That[ i]s fine.

[Sisbarro's Counsel]: Okay.

McDonough testified that he and others from the Authority inspected Sisbarro's facility. He noted that the inspection "was[ no]t a surprise" as they "spoke to . . . Sisbarro . . . or his management team, [to] let them know that we were coming ahead of time."

In terms of facility storage, McDonough testified that the specification required that the facility "must have room for 50 automobiles, 50 cars. And for the Parkway . . . you need room for one bus." On the day of the inspection, McDonough "observ[ed] . . . the storage area was completely full." McDonough stated that when the Sisbarro representative was asked "how he would fit a bus in there that day, [the representative] indicated that he would have to pull

6

vehicles out of the lot, out of the storage area in order to get our bus in there." McDonough testified that Sisbarro's explanation went "against what [wa]s stated within [the] prequal[ification]." McDonough also reviewed photographs that depicted Sisbarro's storage yard as being "completely full."

As to Sisbarro's restrooms, McDonough described that Sisbarro "had one restroom within the confines of the mechanics working area, which [wa]s unsuitable for us. It[ i]s dangerous." Further, McDonough described "a second restroom in which you[ woul]d have to exit the building, walk around a walkway . . . to enter a staircase and move upstairs to what [he] believed was as identified as the employees' lounge area in order to utilize a restroom." McDonough stated this was "not only dangerous, [but] . . . extremely inconvenient for any patrons." McDonough also reviewed photographs that depicted Sisbarro's restroom and passageway.

Sisbarro's president testified that it maintained another lot that was close by, which was only at fifty-percent capacity, and could hold one or more buses. The following exchange occurred:

> [Sisbarro's Counsel]: Could you today meet that criteria as far as vacant space for 50 cars?
>
> [Sisbarro]: We would have to move cars; but yes. And a bus.

A-1978-23

Further, Sisbarro stated that if the bathrooms were not compliant, he "found a portable, although it can be permanent, bathroom facility on-line that [he] c[ould] purchase."

Following the hearing, LaBella authored an eleven-page recommendation detailing the hearing and his decision. LaBella reviewed McDonough's and Sisbarro's president's testimony and pictures of the areas submitted by the parties.

As to storage, LaBella noted McDonough's testimony that on the day of the Authority's inspection, "the storage area was completely full." He noted Sisbarro's president "confirmed . . . the storage area was fil[l]ed to its capacity at the time of the Authority's inspection." Further, "[a]lthough [Sisbarro's president] testified there was an adjunct facility available for Sisbarro to store non-patron vehicles, there was no agreement, lease, deed, or other documentation introduced to prove Sisbarro, in fact, had the legal right to store vehicles in an adjunct facility."

LaBella concluded the "inspection show[ed] not only d[id] the storage area lack the sufficient space to store patron[s'] vehicles but also that there was no possibility there was sufficient space to store even one bus."

A-1978-23

As to Sisbarro's restrooms, LaBella noted McDonough testified that one was a "dangerous condition" and "unsuitable" because it required "patrons . . . to access the restroom by crossing through the mechanic's bay" and the other was "unacceptable" because it required patrons "to exit the building and go up a set of stairs outdoors." LaBella acknowledged Sisbarro was "prepared to install a restroom in the patron waiting area if necessary."

LaBella stated, "the safety of the patron[s] is of primary concern to the Authority." He found "that to require patrons to leave the building, travel outdoors unprotected from the elements, and go up a staircase and through the employee lounge . . . present[ed] an inherently dangerous condition that [wa]s unsuitable." In addition, he found it to be "unsafe" and "extremely inconvenient." Further, LaBella stated "[t]o present a plan on the hearing date to propose the installation of a restroom in the waiting area does not cure Sisbarro's violation of the prequalification criteria regarding providing a suitable restroom."

Therefore, LaBella recommended "the protest filed by Sisbarro challenging the Authority's denial of Sisbarro'[s] prequalification application should be denied."

On February 29, 2024, James Carone, Executive Director of the Authority, "reviewed [LaBella's] recommended decision" and "concur[red] with and adopt[ed] the . . . decision as a final decision of the . . . Authority."

On appeal, Sisbarro contends the Authority erred in denying its prequalification, both procedurally and substantively. Procedurally, Sisbarro argues the Authority's letter of rejection did not state the capacity of its facility was at issue, only the security of the facility. Sisbarro contends it:

> was prepared to furnish evidence at the hearing to show that the facilities complied with Section 3(D)(1) . . . [h]owever, unbeknownst to [it], compliance with Section 3(D)(1) was never in question; instead, [McDonough]'s testimony, even when specifically prompted to discuss [Section] 3(D)(1), regarded issues of whether fifty . . . vehicles and one . . . bus could fit at the Facilities.

Therefore, Sisbarro argues, its due process rights were violated because: (1) the Authority relied on "undisclosed evidence"; (2) it "was never permitted the opportunity to furnish evidence that would have been applicable"; and (3) the Authority "did not adequately safeguard [its] administrative due process rights," relying on Mathews v. Eldridge, 424 U.S. 319 (1976).[2] Sisbarro

---

[2] In Mathews, the United States Supreme Court enunciated a three-factor test when a court considers the constitutional sufficiency of an administrative procedure.

contends "the equitable doctrine of estoppel ought to apply, thereby precluding the [Authority] from repudiating their representation that [it] violated Prequalification Documents Section 3(D)(1)." Further, "the [Authority] during the hearing, should have been estopped from providing testimony and furnishing evidence relevant to Section 3(D)(6)."

Substantively, Sisbarro contends the Authority's decision to reject its prequalification application was arbitrary and capricious. Sisbarro "does not dispute that the lot was at near capacity when the [Authority] inspected [its f]acilities." However, Sisbarro contends Section 3(D)(6) did not "require[ a bidder] to have an empty lot at the time of inspection." Therefore, Sisbarro asserts, because its facilities "were at all relevant times capable of fitting fifty . . . vehicles and one . . . bus; whether they were unable to meet that requirement

---

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [third], the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
>
> [Id. at 335.]

at the immediate instance of the inspection should be entirely irrelevant." Moreover, Sisbarro contends "any standard which requires [a]pplicants to curtail business operations, in an attempt to maintain storage space for fifty (50) vehicles and one (1) bus, without first notifying the [a]pplicants . . . is being arbitrarily and capriciously applied against Sisbarro." Further, "[r]equiring prospective successful bidders to hold their [f]acilities empty for months while awaiting inspection is unreasonable."

In addition, Sisbarro argues "issues regarding storage capacity should be rendered moot by the existence of Sisbarro's second storage facility." Sisbarro acknowledges the Authority "does not, for a good reason, permit [s]uccessful [b]idders to utilize 'satellite (off-site) storage yards.'" However, Sisbarro contends the import of the second facility is not to directly fulfill the contractual obligation to the Authority, but instead evidences that it could put non-Authority vehicles into the other facility, thereby creating "adequate storage space" in the intended contractual facility.

Sisbarro also contends the Authority's rejection of its prequalification application, because of inadequate restrooms was arbitrary and capricious. Sisbarro argues the Authority's "assertion that [its] restrooms are dangerous is meritless and a futile exercise of logical fallacy." Sisbarro contends that the

12

Authority "presupposes" the restrooms "must be inherently dangerous" because they "are located within the confines of the mechanics area and on the second floor."

Nevertheless, Sisbarro notes the restroom in the "mechanics area" is "only mere feet away from the office [where] patrons enter into" and there is a "possibility that a Sisbarro staff member could safely escort patrons to and from the restroom." Moreover, there is nothing "inherently dangerous" about having patrons "walk[] outside and up the stairs" to the other restroom. Further, a finding that a restroom is "inconvenient" is "entirely subjective" and "by definition, arbitrary."

First, we consider Sisbarro's due process arguments. Sisbarro admits the due process arguments are raised for the first time on appeal. Indeed, when LaBella explained the process of the hearing, Sisbarro offered no objection. Moreover, when McDonough testified as to the inadequate space in Sisbarro's facility, Sisbarro offered no objection to the testimony. Instead, Sisbarro testified it had rights to another lot and it could use that lot to relieve the capacity of the facility designated in the prequalification application.

Appellate courts will normally not address issues that were not preserved before an agency. See State v. Robinson, 200 N.J. 1, 20 (2009) (explaining that

"[i]t is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court . . . unless the questions . . . go to the jurisdiction of the trial court or concern matters of great public interest" (alteration in original) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973))); see ZRB, LLC v. N.J. Dep't of Env't Prot., 403 N.J. Super. 531, 536 n.1 (App. Div. 2008) (applying the principle in Robinson and Nieder to appeals from administrative agency orders).  Because this matter does not present questions of jurisdiction or great public interest, we decline to consider Sisbarro's due process argument.

Nonetheless, we offer two comments.  First, Sisbarro's due process argument only addresses the facility's capacity issue.  Sisbarro does not allege any due process violation regarding the Authority's rejection of the application for having insufficient restrooms, the alternative reason for its rejection.

Second, under N.J.A.C. 19:9-2.12(a), the process for "[a]ny actual or prospective bidder, proposer, or contractor who is aggrieved in connection with the solicitation or award of a contract or its prequalification status or classification [is to] protest to the Authority."  Sisbarro did that here.  We conclude Sisbarro's argument under Mathews is misplaced because the administrative code provides Sisbarro sufficient due process protection.

Next, we consider Sisbarro's substantive arguments regarding the Authority's decisions to reject its prequalification application for insufficient facility space and inadequate restrooms. Appellate review of an agency's decision relating to bidding specifications is limited. See George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27 (1994).

> The judicial role is restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid.]

"The 'fundamental consideration' in reviewing agency actions 'is that a court may not substitute its judgment for the expertise of an agency . . . .'" In re Distrib. of Liquid Assets upon Dissolution of Reg'l High Sch. Dist. No. 1, 168 N.J. 1, 10 (2001) (quoting Williams v. Dep't of Hum. Servs., 116 N.J. 102, 107 (1989)). "When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Hermann, 192 N.J. 19, 28 (2007). Therefore, "[a]n administrative agency's final quasi-judicial decision will be sustained unless

15

there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Id. at 27-28. "Deference controls even if the court would have reached a different result in the first instance." Id. at 28.

Prequalification requirements and bidding specifications are the type of matters within the Authority's area of technical expertise and are thus entitled to deference. See In re Protest of Award of On-Line Games Prod. & Operation Servs. Cont., Bid No. 95-X-20175, 279 N.J. Super. 566, 593 (App. Div. 1995) ("Treasurer's decisions as to responsibility of the bidder and bid conformity are to be tested by the ordinary standards governing administrative action.").

"The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." Lavezzi v. State, 219 N.J. 163, 171 (2014) (alteration in original) (quoting In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

Applying these well-established principles, we conclude Sisbarro failed to sustain its burden that the Authority's rejection of its prequalification application was arbitrary, capricious or unreasonable. The Authority determined, during its inspection, that Sisbarro's facility had inadequate space to meet the prequalification specification. Sisbarro's argument that it could not curtail business operations, in the absence of notice of the inspection, is

undermined by McDonough's unrefuted testimony that Sisbarro was on notice of the inspection. Further, Sisbarro admitted that as of the hearing date, it "would have to move cars" to comply.

Moreover, we defer to the Authority's expertise and superior knowledge regarding the restroom facilities needed to service the patrons. The Authority's reasons for the rejection on this basis were supported by the evidence in the record. We decline any invitation to substitute our judgment for the Authority's.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-1978-23