**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2653-22

DON TIGER,

     Petitioner-Appellant,

v.

NEW JERSEY RACING
COMMISSION,

     Respondent-Respondent.

_____

Submitted May 28, 2024 – Decided July 2, 2024

Before Judges Paganelli and Whipple.

On appeal from the New Jersey Racing Commission, Department of Law and Public Safety, Agency Docket No. NJRC-14-H-21-MD.

Gilberto M. Garcia, attorney for appellant.

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Levi Klinger-Christiansen, Deputy Attorney General, on the brief).

PER CURIAM

Don Tiger appeals from an April 11, 2023 Final Decision of the Executive Director of the New Jersey Racing Commission (Commission) that rejected the Administrative Law Judge's (ALJ) recommendation, and upheld the order of finish in the 2021 Meadowlands Pace Race declared official by the Board of Judges (Board).  For the reasons that follow, we affirm.

We recite the procedural history and facts from the record.  The Meadowlands Pace Race was held on July 17, 2021.  The winner of the race received a substantial payment of money and an opportunity to qualify for another prestigious harness race.

Tiger's horse, Charlie May, crossed the finish line first.  However, an incident occurred on the final turn and the Board posted an "inquiry" sign.[1]  The inquiry concerned whether Charlie May broke stride and "interfered"[2] with the horses behind him.

In conducting the inquiry, the Board observed the race live and "looked at all the different possible camera angles."  The Board did not interview the

---

[1]  The Board is required to:  "[p]ost the . . . inquiry sign, on the odds board in the case of a . . . possible rule violation."  N.J.A.C. 13:71-8.24(a)(7).

[2]  "'Interference' means any act, which by design or otherwise, hampers or obstructs any competing horse or horses."  N.J.A.C. 13:71-4.1(b).

drivers of the other horses. Instead, the Board made "the call based on what [it] s[aw] and what [it] s[aw] on the film." The Board unanimously determined that Charlie May broke stride and interfered with the horses behind him. Thus, Charlie May was disqualified and placed ninth.

Tiger filed a notice of appeal, and the Commission transmitted the matter to the Office of Administrative Law (OAL) as a contested case. The ALJ held hearings on December 15, 2021 and January 27, 2022. Tiger testified on his own behalf. Tiger indicated that Charlie May was initially declared the winner. However, an inquiry was sent to the Board. Tiger explained that after a short period of time—only six and a half minutes—the Board disqualified Charlie May and placed him ninth.

Tiger summoned Arthur Gray, who was qualified by the ALJ as an expert, to testify. Gray was a "licensed trainer" and served as a horse race judge in three states, although not in New Jersey. Gray's testimony was limited to "the role, duties and obligations of a race judge." Gray opined after viewing the race several times together with other related materials, the track judges failed to fulfill their responsibilities by not exhausting all means possible to safeguard

the outcome of the race for its contestants and the public at large.[3] Further, Gray opined the Board should have interviewed the drivers.

The ALJ found it of "interest" that Gray explained "at a meeting of regional race officials that took place four months after Charlie May was disqualified, the officials in attendance agreed and adopted something now referred to as the 'Charlie May Rule.'" The purported rule provides that "race officials in their due diligence when the outcome of a race is called into question when interference is alleged, to interview as many drivers and others involved before rendering a decision that may result in disqualification of a winning horse."[4] The ALJ found Gray was "very credible."

The Commission summoned Presiding Judge Peter Koch to testify. Koch stated he was a racing official for forty years, including serving as a racing secretary, associate judge, and presiding judge. He was the presiding judge at the Meadowlands Racetrack since 2019. He stated his duties included enforcing the rules and regulations of the Commission.

---

[3] Gray relied on United States Trotting Association (USTA) Rules and Regulations § 6.11(e) that provides: "It shall be the duty of the judges to: Observe closely performance of the drivers and the horses to ascertain if there are any violations . . . particularly, interference, helping, or inconsistent racing and exhaust all means possible to safeguard the contestants and the public."

[4] The Executive Director found there was no change in policy.

Koch recalled the inquiry in the Meadowlands Pace Race focused on whether Charlie May broke stride and interfered with the horses behind him. In narrating the video during the hearing, Koch explained "when [Charlie May] went around the [horse in front of him], he broke stride and he interfered with three trailing horses. And that was the reason for the inquiry and that was why [Charlie May] was disqualified." Koch testified "there was[ not] any doubt in any of [the judges'] minds that [Charlie May] was off stride and the[] three drivers behind him all had to alter their course and two of them ended up making breaks. It[ wa]s as plain as day." Koch stated he "could[ not] be any more clear on that."

Koch explained that it was not the normal practice for the Board to speak with drivers during an inquiry. He testified that neither the Commission's regulations—nor the USTA Rules and Regulations—required the Board to interview drivers during an inquiry.[5] He acknowledged that judges were able to speak with drivers if there was a need. However, Koch stated the judges make "decision[s based] on what [they] observe[d] during the race and from the camera angles." He explained that judges "feel that [when] talking to drivers

---

[5] Contrary to Gray's testimony as to the purported "Charlie May Rule," Koch testified that there was no change to the USTA Rules and Regulations after the race requiring judges to speak with drivers during an inquiry.

A-2653-22

[they] often . . . g[o]t biased opinions and skewed opinions so . . . the fairest way [wa]s to just make the decision based on camera angles and what [they] saw during the race." Koch testified that the judges voted unanimously to disqualify Charlie May.

The ALJ stated "Koch's years of experience in the racing industry [we]re well respected." However, the ALJ found, "for reasons unknown it appeared throughout his entire time testifying, even over a virtual Zoom platform that he was uncomfortable, was looking away from the camera and several of his answers were evasive." The ALJ noted "[f]or example, every time a question was posed, [Koch] repeated the question before giving an answer, whereas most witnesses who are confident in what they [we]re saying would simply go ahead and answer the question."

The ALJ found Koch's answers—"that he did[ no]t believe the drivers would give honest answers, or that their version of events would be biased"— for "why he and other judges elected not to interview any of the drivers or interested parties" or "conduct a more thorough investigation" was "[c]urious[]" and "suspect."

The ALJ noted "Koch knew the purse in the race Charlie May initially won was significant and disqualification would bar Charlie May from entering

[an] even more lucrative . . . race . . . [but] he still did not deem it necessary or spend more than six and a half minutes on the issue, before the [Board] . . . issued its disqualification ruling."

Moreover, the ALJ found two aspects of Koch's testimony troubling. First, Koch testified "he learned 'for the first time after the race, that his wife, who was involved in a horse staking business, had an interest in the outcome of the race with two other horses that had been entered.'" The ALJ found Koch's explanation—"[t]hat's her business"—unconvincing and concluded "the appearance of potential conflict should have been sufficient cause for him to step aside as the chief judge handling the track side appeal."

Second, about two weeks after disqualifying Charlie May, Koch "called for a panel investigation of Charlie May's driver . . . (who had never been the subject of an investigation) to determine if he should be penalized or suspended on top of the horse being disqualified."

The ALJ stated Koch was an expert, so he could not "disregard or throw out his entire testimony," despite Koch's "obvious credibility challenges."[6] Nonetheless, noting Koch's "body language and manner of answering questions,

---

[6] The Commission offered Koch as a fact, not an expert witness.

A-2653-22

coupled with the potential conflict of his wife having an interest in two other horses in the race," the ALJ found the testimony of Koch, "who was the only witness produced by the [Commission], was significantly diminished, and devalued, by virtue of his lack of credibility."

The ALJ made the following factual findings:

> A close and lengthy review of the tape of the entire race which took over an hour during the hearing clearly show[ed] that just before the alleged incident that gave rise to the disqualification, the horse immediately in front of Charlie May started slowing down[7], with its driver looking back to see how many horses were behind it.
>
> Based on the video and the testimony of [Tiger] and [Gray], I FIND that even if Charlie May did slightly "break stride" at that point of the race, it was a safety measure only to ensure that a major collision could be avoided with several of the horses, which would have been a catastrophe for everyone involved. Including viewers watching this nationally televised race at home. I FURTHER FIND that the actions of Charlie May's driver, which had to be made in a split second as shown on the video, were appropriate under the circumstances and did not interfere with the progress of any other horses in the race, which the track side judges improperly determined.
>
> . . . .

---

[7] In another part of his recommendation, the ALJ stated "[t]he tape . . . not only does not show any interference by Charlie May, but in fact shows that the horse in front of Charlie May slowed down drastically."

> I FURTHER FIND that the appeal conducted by the track side judges was flawed, in that it was rushed, due in part to the race being broadcast to a national television audience . . . and, among other things, [the Board] failed to follow protocols, including but not limited to conducting interviews with several of the parties involved in the race prior to determining that Charlie May should be disqualified. With such a large purse at stake, as well as eligibility for an even larger purse through automatic entry in another . . . race, I FIND the outcome of the short track side appeal, which was upheld by the . . . Commission, was anything but thorough, was arbitrary and capricious and fatally flawed.

The ALJ concluded the Board "did the expedient thing, instead of conducting due diligence." He found it was "undisputed the judges failed to question any drivers, or other parties involved in the race for that matter, and after conferring for only a few minutes, disqualified Charlie May."

In addition, the ALJ concluded "that the decision of the [Board] . . . was fatally flawed due to a conflict of interest that existed on the part of . . . Koch." The ALJ found "it strain[ed] credibility and common sense that [Koch] was completely unaware [his wife's] company had an interest in other horses who were racing that day."

Thus, the ALJ ordered:

> That the determination of the [Board] . . . must be REVERSED, as it was arbitrary, capricious and unjust, and violated [Tiger's] fundamental due process rights,

9

and the rights of the wagering public, whose interests the track side judges, and the . . . Commission [we]re supposed to protect . . . .

He further ordered "that Charlie May should be reinstated as the winner of the Meadowlands Pace [Race]." The Commission filed exceptions and Tiger filed a reply to the exceptions.

The Executive Director rejected the ALJ's recommendation, including his: (1) credibility determinations; (2) application of the law; and (3) findings of fact. As to the ALJ's credibility determinations, the Executive Director acknowledged "the deference that [wa]s usually afforded to an [ALJ]'s determination of credibility." However, the Executive Director rejected the ALJ's credibility findings "because they [we]re arbitrary, capricious and unreasonable and they [we]re not supported by sufficient, competent and credible evidence in the record."

First, the Executive Director accepted that Koch "may have appeared 'uncomfortable' testifying." The Executive Director noted there was no video recording of the Zoom hearing, so she could not review Koch's appearance. Nonetheless, the Executive Director found the ALJ "clearly erred when he asserted that . . . Koch repeated the question 'every time a question was posed.'" Instead, the Executive Director found, through her review of the transcript of

Koch's testimony, he "was asked more than 250 questions at the hearing" and "repeated a question only six times and he asked to have a question clarified ten times." Moreover, the Executive Director did "not find . . . Koch's answers to be evasive."

Second, the Executive Director stated "[t]he video recordings of the race . . . g[a]ve[] [her] the ability to directly assess the truth and accuracy of . . . Koch's testimony." In this respect, the Executive Director found "Koch's testimony regarding the break and interference was clear, truthful, and accurate."

Third, the Executive Director determined Koch "accurately explained the procedures utilized by the [Board] and why there was no need to interview a driver." The Executive Director accepted Koch's testimony that the Board "officiate[s] a race on the basis of what they see in the race and on the video recordings and they do not believe that the opinions of the drivers involved in the incident 'should have a bearing on the way they see it.'"

Fourth, the Executive Director rejected the ALJ's "finding that the services of staking company, even if . . . Koch's spouse performed them for two horses

11

in the race, created a real or apparent conflict of interest."[8]  The Executive

Director explained:

> A staking company processes necessary paperwork on behalf of horses' owners and forwards nominating and sustaining fees paid by the owners to the entity that own[s] the rights to the stakes race.  The staking company does not own an interest in the horse, enter the horse into the stakes race nor receive any payment should the horse win purse money in the race.  An owner pays the staking company a fee to take administrative actions to ensure that a horse is nominated to and remains eligible for one or more stakes in the horse.  By way of example, a staking company has no more financial or other interest in a particular horse than a hired transportation service that transports a horse to the racetrack prior to a race has in the horse.  Accepting a fee to facilitate a horse's ultimate participation in a race in those tangential ways does not give the facilitator an interest in the horse.

In addition, the Executive Director found that "Koch only learned of th[e

apparent conflict of interest] on cross-examination at the [ALJ's] hearing."

Therefore, she "reject[ed] the ALJ's conclusion that . . . Koch was required to or

should have recused himself" on the day of the race.

---

[8]  The Executive Director noted "the OAL record d[id] not establish that . . . Koch's wife's company did, in fact, process stakes paperwork and submit fees on behalf of the owners of two horses in the race."  Instead, the Executive Director stated the "uncorroborated assertion was proffered by [Tiger]'s counsel" during cross-examination of Koch.

Fifth, the Executive Director rejected the ALJ's finding that the hearing regarding Charlie May's driver, held two-weeks after the race, was "troubling." Instead, the Executive Director accepted Koch's "accurate explanation" that "the judges must send the driver a written notice of the hearing, it cannot be done on the day of the race and it [wa]s not unusual to conduct a hearing [ten] to [fourteen] days after a race for a driver."

As to Gray, the Executive Director rejected as speculation, his opinion that "the television broadcast of the race 'created additional pressure on the judges to make a fast decision.'" In addition, the Executive Director found that Gray erred in relying on USTA Rule 6.11(e).

Moreover, the Executive Director rejected the ALJ's legal determinations. First, the Executive Director found "there [wa]s no due process requirement in New Jersey which mandate[d] that the judges must interview the drivers or any other licensee during an inquiry."

Second, the Executive Director found "N.J.A.C. 13:71-8.23 set[] forth the duties of the [Board] and N.J.A.C. 13:71-8.24 set[] forth the procedures the [Board] must follow." She determined the Commission's rules "only require[d] the judges to speak to a driver if the driver lodge[d] an objection after the race . . . . [and n]o objection was lodged after th[e] race."

13

Third, the Executive Director found the Board "may speak with the drivers during an inquiry if they believe it might assist them in their determination." Here, she determined "there was no need to interview the drivers during the inquiry . . . . [because a]ll material and relevant facts [we]re documented clearly and obviously on the video recordings of the race."

Fourth, the Executive Director found "the OAL record d[id] not support the ALJ's conclusion that 'well recognized industry and regulatory standards' require[d] judges to interview drivers during an inquiry."

Fifth, the Executive Director "reject[ed] the ALJ's finding that 'the outcome of the short track side appeal[] . . . was anything but thorough, was arbitrary, capricious and fatally flawed.'" Instead, the Executive Director found the "clear preponderance of the credible evidence in the OAL record establishe[d] that the [Board] followed the proper procedure during the inquiry and reached the correct determination."

Sixth, the Executive Director rejected the ALJ's conclusion that the decision of the Board was "fatally flawed" because of Koch's alleged conflict of interest. The Executive Director "reject[ed] the finding that [Koch's wife] held an interest, financial or otherwise in two horses that were entered in the race." Moreover, she concluded even if Koch's wife's company "[a]ccept[ed] a fee to

14

facilitate a horse's ultimate participation in a race in . . . tangential ways [it] d[id] not give the facilitator an interest in the horse."

Lastly, the Executive Director found "[t]he video recordings d[id] not support" the ALJ's factual finding. Instead, the Executive Director found the video recording:

> establishe[d] that although the [horse in front] was beginning to tire, it did not slow down drastically or nearly cause an accident. It was not unusual or improper for the driver of Charlie May to move the horse out to go around the [horse in front]. When Charlie May moved out, the horse broke stride and impermissibly interfered with the [horses behind].

Tiger appeals, arguing the Executive Director's decision was arbitrary, capricious, and unreasonable. Tiger contends the Executive Director failed to: (1) identify the factual errors in the ALJ's recommendation; (2) set forth "with particularity . . . new or modified findings supported by sufficient, competent, and credible evidence"; (3) respect and "arbitrarily rejected" the recommendation that "the appeal conducted by the track judges was flawed, in that it was rushed"; and (4) find that due process required the track judges to interview the other drivers. We disagree.

We begin our discussion with a review of the principles governing our analysis. Pursuant to N.J.S.A. 52:14B-10(c):

15

All hearings of a State agency required to be conducted as a contested case under this act or any other law shall be conducted by an [ALJ] . . . . A recommended report and decision which contains recommended findings of fact and conclusions of law and which shall be based upon sufficient, competent, and credible evidence shall be filed[] . . . with the agency . . . and an opportunity shall be afforded each party of record to file exceptions, objections, and replies thereto, and to present argument to the head of the agency or a majority thereof, either orally or in writing, as the agency may direct.

                . . . .

The head of the agency, upon a review of the record submitted by the [ALJ], shall adopt, reject or modify the recommended report and decision . . . . In reviewing the decision of an [ALJ], the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so. The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record . . . .

Thus, "[i]t is the agency head's responsibility to decide adjudicated matters brought before the agency." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 586 (1988). "[T]he agency head must explain why the ALJ's decision was not supported by

16

sufficient credible evidence or was otherwise arbitrary." Cavalieri v. Bd. of Trs. of Pub. Emps. Ret. Sys., 368 N.J. Super. 527, 534 (App. Div. 2004) (citing N.J.S.A. 52:14B-10(c); S.D. v. Div. of Med. Assistance & Health Servs., 349 N.J. Super. 480, 485 (App. Div. 2002)).

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Ibid. (quoting Herrmann, 192 N.J. at 27-28).

We examine:

> (1) whether the agency's action violates express or implied legislative polices, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant facts.
>
> [Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

A-2653-22

"In assessing those criteria, a court must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). "We have upheld the strict and close regulation of the racing industry; we recognize and give deference to the Racing Commission's expertise." Moiseyev v. N.J. Racing Comm'n, 239 N.J. Super. 1, 7 (App. Div. 1989) (citing De Vitis v. N.J. Racing Comm'n, 202 N.J. Super. 484, 490-91 (App. Div. 1985)). "We understand that the overriding goal in the regulations is to insure the public's confidence in the integrity of horse racing." Ibid. (citing Dare v. State, 159 N.J. Super. 533, 537 (App. Div. 1978)). We do not "substitute [our] own judgment for the agency's." Circus Liquors, 199 N.J. at 10 (quoting Carter, 191 N.J. at 483).

However, we are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Allstars, 234 N.J. at 158 (alteration in original) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

The party challenging the final administrative action has the burden to demonstrate grounds for reversal. Lavezzi v. State, 219 N.J. 163, 171 (2014) (quoting In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)). Applying these well-established principles, we are satisfied Tiger failed to meet his burden.

A-2653-22

The Executive Director satisfactorily conducted her review of the ALJ's recommendation under N.J.S.A. 52:14B-10(c). The Executive Director rejected the ALJ's findings of fact; clearly stated her reasons for doing so; provided particular reasons for rejecting the ALJ's findings; and made new findings supported by sufficient, competent, and credible evidence in the record. Ibid. Given our deference to the Executive Director's expertise and superior knowledge in the field, we do not substitute our judgment for hers.

In addition, while we are not bound by the Executive Director's interpretation of the law, we are convinced neither the Commission's nor the USTA's Rules and Regulations required the Board to interview the drivers during the inquiry. Considering the video evidence, we are satisfied driver interviews were not necessary.

The regulations provide that the judges shall "[i]nvestigate any apparent or possible interference or other violation of the rules whether or not a complaint has been made by a driver," N.J.A.C. 13:71-8.23(a)(2); and "[o]bserve the performance of the drivers and the horses closely to ascertain if there are any violations of the[] rules. They shall exhaust all means possible to safeguard the contestants and the public," N.J.A.C. 13:71-8.23(a)(5). Gray cited to the USTA

19

standard but acknowledged the Commission's regulations and the USTA standard were functionally the same.

Gray interpreted "exhaust all means" to require the Board to interview the drivers in conducting the inquiry. However, "exhaust" is defined as: "to consider or discuss (a subject) thoroughly or completely." Merriam-Webster's Collegiate Dictionary 437 (11th ed. 2020). In this respect, Koch testified that the Board watched the race live and reviewed all of the video of the race. Koch stated the video made it "plain as day" and it "could[ no]t have been any more clear" that Charlie May broke stride and interfered with the horses behind him. The Board did not interview the drivers based on the clarity of the video and their concern that drivers would provide biased or skewed opinions. Under these circumstances we are satisfied that the investigation was exhaustive.

In addition, we are convinced that Koch's wife's ownership of a staking company—that purportedly staked horses in the race—did not create a conflict of interest for Koch. The regulations provide that "[n]o race official shall be qualified to act as such at any meeting or race where he [or she] is . . . the owner or otherwise interested in the ownership of any horse participating at such meeting or race." N.J.A.C. 13:71-8.14(b). Even assuming Koch's wife's company staked horses in the race, we are not persuaded that was enough to

create an ownership interest in those horses or imbue Koch with that interest. Again, we defer to the Executive Director's expertise and superior knowledge of the horse staking industry; and find no conflict of interest.

Lastly, the Executive Director rejected the ALJ's credibility findings. The Executive Director recognized that ordinarily she would defer to the ALJ on this issue, but detailed why the ALJ's credibility findings were arbitrary, capricious or unreasonable and not supported by sufficient, competent, and credible evidence in the record, namely the race videos. We find no error in this determination.

To the extent we have not addressed any of Tiger's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION